Robert MUENCH, Petitioner-Appellant,

v.

Thomas ISRAEL and Attorney General of Wisconsin, Respondents-Appellees.

Richard WORTHING, Petitioner-Appellant,

v.

Thomas R. ISRAEL, Respondent-Appellee.

Nos. 81–2094, 81–2789.

United States Court of Appeals, Seventh Circuit.

Argued and Submitted * May 5, 1982.

Decided Aug. 15, 1983.

Rehearing and Rehearing En Banc Denied Dec. 6, 1983.

* Pursuant to the agreement of the parties, No. 81–2789 was submitted for decision on the briefs without oral argument.

Charles Bennett Vetzner, State Public Defender, Madison, Wis., for petitioner-appellant.

Michael R. Klos, Wis. Dept. of Justice, Madison, Wis., for respondents-appellees.

Before CUDAHY and ESCHBACH, Circuit Judges, and TEMPLAR, Senior District Judge.[**]

ESCHBACH, Circuit Judge.

The appellants in these consolidated appeals are each serving life prison terms in Wisconsin for first-degree murder. Each filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 claiming that his murder trial was fundamentally unfair because he was not permitted to introduce expert testimony regarding his capacity to form the intent to kill. The courts below denied the petitions. For the reasons which follow, we affirm the judgments of the district courts.

[**] The Honorable George Templar, Senior District Judge for the District of Kansas, sitting by designation.

## I

The following facts surrounding the homicide of which Robert Muench was convicted are not in dispute. On the evening of August 2, 1971, Muench and a friend, Dennis Faber, both employees at a local carnival, went to a bar in Chippewa Falls, Wisconsin. A group of fellow carnival employees later arrived at the bar, including the soon-to-be deceased Hippie Bertilson. During the evening, Muench and Faber had several arguments with Bertilson and his friends. When Muench and Faber left the bar, Bertilson and his group did as well, and a series of fights ensued in which both Faber and Muench were struck on the head. Bertilson was the principal aggressor. The fighting ceased and Muench and Faber were told to leave. They went to Faber's car where Faber obtained a gun and Muench obtained a knife. Faber then approached Bertilson with gun in hand. Bertilson jumped Faber and the two fell to the ground, struggling for the gun. Muench grabbed Bertilson by the collar, pulling him away from Faber, and stabbed Bertilson twice in the back. Muench and Faber then fled the scene in Faber's car. The next day, Muench and Faber turned themselves in to the police. Bertilson died from the knife wounds inflicted by Muench.

Muench was charged with first-degree murder under Wisconsin law. Wis.Stat. § 940.01. He pled not guilty; he did not plead the defense of insanity. Muench testified in his own defense that he could not remember anything that happened on the evening of August 2, 1971 from the time he was struck on the head in the initial fight. Faber testified that as they were leaving the scene in his car Muench told him "he thought he might have stabbed someone, but he didn't know," adding, "he didn't know if he stabbed one or two guys or if he stabbed anyone." Other testimony revealed that Muench had been drinking the night in question, and there was conflicting

testimony concerning his degree of intoxication.

The defense also called to the stand a psychiatrist who had examined Muench and declared him mentally fit to stand trial. Following a preliminary question by defense counsel asking the psychiatrist if he had recently examined Muench, the following colloquy transpired:

MR. FALKENBERG [prosecutor]: Your Honor, I am going to object to any questions.

THE COURT: Objection sustained. You want to be heard in the absence of the jury, Mr. Sinclair?

MR. SINCLAIR [defense counsel]: Why don't we take a recess.

THE COURT: Well, I will send the jury out. Take the jury out for a few moments.

(At 3:34 p.m. the jury was taken from the courtroom. In their absence the following occurred:)

THE COURT: Well, now in view of the objection and sustaining the objection, Mr. Sinclair, if you would like to make an offer of proof by asking Dr. Chapman the questions that you propose to ask of him, you may do so or you may state in what way you feel the testimony of Dr. Chapman is admissible. My understanding of this case is that the plea is not guilty, there is no counter plea of not guilty by virtue of mental disease.

MR. SINCLAIR: What was the basis of the objection?

MR. FALKENBERG: The basis, your Honor, of the objection is that the examina[ ]tion of Mr. Muench is immaterial in view of the fact there has been a plea of not guilty only here.

THE COURT: Yes, that's what I understood it to be.

MR. SINCLAIR: Well, then let the record show that if some degrees of homicide are submitted as a verdict to this jury, the test of what a reasonable man would do under certain circumstances will be the test and the testimony of Dr. Chapman indicates that Robert Muench has been diagnosed as an inadequate personality and as such I don't think he can be held to the test of a reasonable man.

THE COURT: You are making that in the offer of proof. Is that what you are indicating Dr. Chapman will testify to?

MR. SINCLAIR: Yes.

THE COURT: And does it bear on intent?

MR. SINCLAIR: Yes.

THE COURT: The objection is sustained and the offer of proof is denied.

MR. SINCLAIR: That's all, Doctor.

THE COURT: It's my understanding, gentlemen, that our Supreme Court has answered that question very definitely. I don't know if I remember the title of the case but it's a very recent case. We are at the guilt stage now, we are not at personality deficiencies or mental defect problems. If we were to permit testimony concerning the mental condition, character or otherwise, it would seem to me that we would thwart the statute and we have such a plea available and we have facilities for the treatment in the event there is a finding of not guilty by virtue of it. So I don't see how we can do by indirection what we otherwise could not do, and that's the basis for my ruling. * *

At the close of the evidence, the trial court instructed the jury on both first-degree and second-degree murder and gave an instruction on voluntary intoxication. Regarding intent, it instructed, inter alia: "When there are no circumstances to prevent or rebut the presumption, the law presumes that a reasonable person intends all of the natural, probable and usual consequences of his deliberate acts."

At the jury's request, the instructions on the two degrees of murder and the foregoing instruction on intent were repeated to them during their deliberations. At no time did the defense object to these instructions.

The jury found Muench guilty of first-degree murder. Muench was sentenced to life imprisonment.

In his appeal before the Wisconsin Supreme Court, defendant asserted only one

federal constitutional attack on his conviction: that he was incompetent to stand trial due to his purported amnesia. Moreover, he made several state law claims of error, only two of which are germane here. First he argued that he should be granted a new trial in order to permit him to raise an insanity defense. Second, he argued that the trial court erred under state law in refusing to admit psychiatric testimony "that he suffered from a personality disturbance and that he was not capable of forming the intent necessary for first degree murder." Muench argued that the state rule excluding such testimony in the first phase of a bifurcated trial where the defense of insanity is raised should not apply in a trial in which the insanity defense is not raised.

The Wisconsin Supreme Court affirmed the conviction, holding the following on the psychiatric testimony argument:

> If a person is to be found incapable of forming the necessary criminal intent because of mental disease or deficiency such defense must be pursued by a plea of not guilty because of mental disease or deficiency and established in a bifurcated trial.
>
> In *State v. Hebard* (1971), 50 Wis.2d 408, 418, 184 N.W.2d 156, 162, we stated:
>
> "... If all, or nearly all, of the testimony (predictably psychiatric evaluations of the mental condition of the defendant at the time of the crime) that is relevant on the issue of insanity, is also material on the element of intent, the basis and reason for affording an option to bifurcate the trial are gone. In fact, if testimony as to mental condition relates to both issues, there would seem no sound reason left for a plea of not guilty by reason of insanity. Proof adequate to establish insanity would be at least adequate to raise a doubt as to intent and the long standing dispute as to who is to be held criminally responsible for wrongdoing would be replaced by disputes as to what degree of emotional or mental disorders would be sufficient to cast a doubt as to intent...."

*Muench v. State,* 60 Wis.2d 386, 395–96, 210 N.W.2d 716, 721 (1973).

Muench instituted a post-conviction proceeding pursuant to Wis.Stat. § 974.06, apparently sometime in early 1980, in which he challenged the constitutionality of excluding the psychiatric testimony, apparently on the authority of our decision in *Hughes v. Mathews,* 576 F.2d 1250 (7th Cir.), *cert. dismissed sub nom., Israel v. Hughes,* 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978). His petition for relief was apparently dismissed on June 30, 1980 on the basis of the decision of the Wisconsin Supreme Court in *Steele v. State,* 97 Wis.2d 72, 294 N.W.2d 2 (1980).

On July 10, 1980, Muench filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Wisconsin. The district court denied the petition. 514 F.Supp. 1194 (E.D.Wis.1981).

The first argument considered by the district court was petitioner's contention that the intent instruction given at his trial, in conjunction with the exclusion of the psychiatric testimony, created an impermissible conclusive presumption and relieved the prosecution of its burden of proving the essential element of intent under the analysis set forth in *Hughes v. Mathews, supra.* The district court noted the factual similarities between Hughes' and Muench's cases, but concluded *Hughes* was distinguishable, and held that the instruction coupled with the excluded testimony did not operate to create a conclusive presumption in Muench's trial, relying on its prior decision in *Muller v. Israel,* 510 F.Supp. 730 (E.D. Wis.1981). Muench does not appeal from this ruling of the district court.

The district court next considered petitioner's argument that the exclusion of psychiatric testimony, standing alone, deprived petitioner of his right to present relevant and competent evidence under the alternative holding in *Hughes.* The district court carefully analyzed this question, and concluded that since our decision in *Hughes,* the Wisconsin Supreme Court had determined that psychiatric testimony was nei-

ther relevant nor competent on the issue of intent, and that this evidentiary rule was not arbitrary and hence was constitutionally permissible.

Lastly, the district court rejected petitioner's argument that the intent instruction, standing alone, created a mandatory presumption on an essential element of the crime in contravention of *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), again relying on its decision in *Muller v. Israel, supra.*

On appeal, petitioner presents only the latter two issues for review. Moreover, only the exclusion of psychiatric testimony issue has been briefed; the parties did not brief the issue concerning the constitutionality of the intent instruction due to the pendency of a case presenting the same question on the same stock instruction. That case has since been decided, and the instruction was held constitutional. *Pigee v. Israel,* 670 F.2d 690 (7th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 103, 74 L.Ed.2d 93 (1982).

## II

The following facts surrounding the homicide of which Richard Worthing was convicted are not in dispute. Richard Worthing and his wife, Marilyn, were divorced in early 1976. Worthing believed that Donald Walsh had been having an affair with his wife and was upset about it, thinking that Walsh was partially responsible for his marital problems. He began drinking heavily, and attempted to discuss reconciliation with his wife on many occasions. On Christmas Eve 1976, Worthing felt lonely and drowned his sorrows at several local taverns.

On Christmas morning, he visited his ex-wife and children. He again attempted to discuss reconciliation with her, but the encounter ended in tears. Worthing left, saying he "wouldn't hurt her or Don." Worthing spent the afternoon and early evening with two friends. He had some drinks, but there was no indication that he was intoxicated. He left his friends' residence about 8:30 p.m. Between 9:00 and 9:30 p.m. he was driving by the home of his former

mother-in-law, and when he saw Walsh's car there, he decided to stop. Worthing went to the door of the house, in which a family gathering was taking place. "When I got there," Worthing testified, "and the door opened and I saw Donald and Marilyn there, I guess I just saw red. I don't know what I said, but then I remember Jim backing me out of the door." Several individuals testified that Worthing was repeatedly saying something to the effect "This is a lousy Christmas. This is the guy that broke up my family." Worthing was escorted out of the house and left soon after speaking to one of his ex-wife's brothers.

Approximately twenty to thirty minutes later, as Marilyn and Walsh were leaving the house, Worthing appeared from the back of the house, yelled something, and fired two shots in rapid succession, and then after a short pause, a third shot from a .38 caliber revolver. Walsh called out Marilyn's name and fell to the ground, mortally wounded. When his ex-wife asked Worthing why he had shot Walsh, Worthing responded: "I had to." When the police arrived moments later, Worthing stated: "I shot him 3 times. I hope he's all right. I should have done this a long time ago." At the police station, Worthing appeared nervous, kept repeating himself, and could not sit still. In a statement to the district attorney the next morning, Worthing indicated that he did not go to the house to kill Walsh, although he realized there would be a confrontation. He also said he had placed the revolver in his car the previous week.

Worthing was charged with first-degree murder. He pled both not guilty and not guilty by reason of insanity. In addition to the foregoing recited testimony given by Worthing, he claimed a lapse of memory between the time he stopped at the house until the time he shot Walsh. Moreover, one of Worthing's friends with whom he had been on Christmas Day testified that Worthing had "a Dr. Jekyl[l] and Mr. Hyde-type personality" when he was drinking. During off-the-record discussions during the first phase of the bifurcated trial, the possibility of introducing psychiatric testimony during the first phase of the trial was

forwarded, but the trial judge deemed such testimony inappropriate on the basis of an unidentified Wisconsin Supreme Court decision. The court instructed the jury on both first-degree and second-degree murder, and gave a voluntary intoxication instruction.

During the second phase of the bifurcated trial, Worthing introduced lengthy testimony from a number of psychiatrists. The state introduced its own psychiatric testimony. After examining one of his expert witnesses, a psychologist, defense counsel was granted permission to make a record (out of the presence of the jury) of what the psychologist would have testified if he had been permitted to testify during the *first* phase of the trial. After defense counsel made several unsuccessful attempts at making the psychologist understand the question, the following colloquy transpired:

Q. If I'd put you on the stand in the primal part of the case, the first part of the case, and I asked you, Doctor, having heard and then reciting everything that you have heard, such as Worthing's testimony, and having available to you all the information that has been available to you today, having had all that information, would you give me a professional opinion as to whether or not Richard Worthing was able to form the specific intent to kill when he shot Donald Walsh on Christmas, whether you would be able to give me an opinion?

A. Probably, yes.

Q. And what would that opinion have been?

A. Whatever the opinion was, I'm not sure if I could make it to a reasonable degree of medical certainty.

MR. DOHERTY [Defense Counsel]: I have nothing further.

THE COURT: Doctor, you had been asked these questions during the course of the trial and I'd like to have you tell me what your answer would have been. Based on your interviews with the defendant, and upon the knowledge that you have gained during the course of this trial, do you have an opinion to a reasonable degree of medical probability as to whether the defendant, because of his condition, was able to form the specific intent of murder in the first degree?

THE WITNESS: That I would be able to answer?

THE COURT: You do have an opinion to a reasonable degree of certainty?

THE WITNESS: Yes.

THE COURT: And how would you have answered that?

THE WITNESS: I don't think he could have formed the intent to commit first degree murder because of the presence of mental illness.

THE COURT: Because of the presence of mental illness?

THE WITNESS: Yes, which interfered.

The trial judge proceeded to ask the witness whether he would have ventured an expert opinion as to whether Worthing was so intoxicated that he lacked the capacity to have the intent to kill, and the witness responded that he would have testified that Worthing was "not unable" to form the intent to kill because of intoxication, *i.e.,* Worthing was not so intoxicated that he lacked the capacity to form an intent to kill. The witness noted, however, that he was not a physician.

The jury rejected Worthing's insanity defense. Worthing was sentenced to life imprisonment in December 1977.

Worthing was granted a series of extensions of time in which to file a motion for a new trial. By the time the trial court ruled on the motion, granting Worthing a new trial, our decision in *Hughes* had been rendered and the Wisconsin Supreme Court had overruled previous cases which held psychiatric testimony inadmissible in the guilt phase of a bifurcated trial on the basis of *Hughes. See Schimmel v. State,* 84 Wis.2d 287, 267 N.W.2d 271 (1978). The state appealed the order granting a new trial to the Wisconsin Court of Appeals. By the time the Court of Appeals ruled on the appeal, the Wisconsin Supreme Court had decided the *Steele* case, which overruled *Schimmel.* In an unpublished order dated September 24, 1980, the Court of Appeals reversed the order granting a new trial on the authority of *Steele.*

Worthing filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Wisconsin on October 2, 1980. The only ground asserted by petitioner was that the exclusion of psychiatric testimony regarding *mens rea* during the first portion of his bifurcated trial deprived him of due process under our decision in *Hughes*. The district court analyzed this question and reached the same conclusion as did the district court in Muench's case, and adopted the reasoning in that case as well in denying Worthing's petition.

### III

■ We first briefly address the question which is raised solely by Muench concerning the jury instruction on intent. In *Pigee v. Israel, supra,* this court analyzed the constitutionality of Wisconsin Criminal Jury Instruction 1100, and held under the controlling Supreme Court authority of *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) and *Ulster County Court v. Allen*, 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979), that the instruction did not pose the risk of relieving the prosecution of its constitutional obligation to prove all elements of the crime beyond a reasonable doubt. *Pigee* therefore is controlling on the only issue regarding this instruction which Muench raises in his appeal. Indeed, in light of the fact that Muench did not brief this question due to the pendency of the *Pigee* appeal, and in view of the fact that Muench has not attempted to file any supplementary briefs concerning this question in an attempt to distinguish or otherwise question the controlling nature of *Pigee,* it appears that Muench tacitly concedes that *Pigee* is controlling.

### IV

We next address the major question presented in this case: the constitutionality of Wisconsin's rule excluding psychiatric opinion testimony offered to prove that the defendant lacked the capacity to form a specific intent. Specifically, we must determine whether petitioners were deprived of liberty without due process of law by virtue of the exclusion of psychiatric testimony

offered to show that they lacked the ability to form an intent to kill, which under Wisconsin law is defined as "the mental purpose to take the life of a human being." Wis.Stats. § 940.01. Petitioners argue that since an intent to kill is an essential element of the crime of which they were convicted, their interrelated rights to present evidence in their defense and to be convicted only upon establishment of this essential element beyond a reasonable doubt were offended by the exclusion of the psychiatric testimony regarding their mental illness in their trials on their not guilty pleas.

"At first blush, it may appear that, on the main issue of guilty or not guilty, it would be a violation of the rights of the accused to shut out any evidence pertinent to the question, or going to the question of intent, especially in cases of murder in the first degree." This quotation, which might well have been taken from the briefs in the instant case, is a century old. The language appears in the Reviser's Notes to the statute establishing Wisconsin's early bifurcated trial procedure on insanity in criminal cases. Wis.Stats. §§ 4697–4699 (1899) (Vol. II at 2344). In the ten decades since the argument petitioners now raise was first recognized, many courts have puzzled over the question in a wide range of contexts and have reached different conclusions. Our task is to determine whether the position taken on the question by the Wisconsin courts is so without legal foundation that it constitutes a violation of the Fourteenth Amendment's due process clause. We begin this task with an examination of basic Wisconsin doctrine concerning mental illness and the criminal law.

#### A. The Definition of Insanity under Wisconsin Criminal Law

Wisconsin has long recognized that certain mentally ill individuals should not be held accountable under the criminal law. Its early common law formulation of a legal definition of "insanity" precluding such accountability is somewhat unclear; however, it appears that at the turn of the twentieth century it had adopted the position that the exclusive test of sanity *vel non*

was whether the defendant knew at the time of his act that his conduct was wrong. *Oborn v. State,* 143 Wis. 249, 126 N.W. 737 (1910). In *State v. Esser,* 16 Wis.2d 567, 115 N.W.2d 505 (1962), Justice (now Senior Circuit Judge) Fairchild exhaustively traced the history of the insanity defense both at early English common law and in earlier Wisconsin decisions in a search for the most appropriate definition of insanity for Wisconsin, observing that the fundamental question with which society is faced when a mentally ill person engages in criminal conduct is whether the accused was so afflicted with the illness "that society cannot, in good conscience, hold him responsible for the conduct as crime, *i.e.* punish him." *Id.* at 585, 115 N.W.2d at 515. Justice Fairchild examined the many factors influencing a choice of an appropriate standard to guide the jury on this question, including the then statutorily imposed burden of proof regarding sanity placed on the prosecution, the fact that the insanity defense is used most frequently in murder trials in conjunction with the fact that Wisconsin does not have a death penalty, the need for hospitalizing the dangerous mentally ill, the nature and limitations of psychiatric testimony, and actual experience under the various standards. *Id.* at 585–93, 115 N.W.2d at 516–21. The majority of the court decided to adopt a verbal variant of the two-part formulation of insanity first enunciated in *Daniel M'Naghten's Case,* 8 Eng.Rep. 718, 10 Cl. & Fin. 200 (1843), approving the following definition:

> The term "insanity" in the law means such an abnormal condition of the mind, from any cause, as to render the defendant incapable of understanding the nature and quality of the alleged wrongful act, or incapable of distinguishing between right and wrong with respect to such act.

16 Wis.2d at 599, 115 N.W.2d at 522.

The American Law Institute's Model Penal Code definition of insanity, considered broader and less sensitive to the deterrence function of the criminal law, was considered and rejected by the court, in large part because of the statutory requirement that the prosecution bear the burden of proof on insanity.

In *State v. Shoffner,* 31 Wis.2d 412, 143 N.W.2d 458 (1966), the court once again addressed the appropriate standard of insanity in criminal cases, and decided to permit a criminal defendant to elect to be tried under the ALI test if and only if he assumed the burden of persuasion on the insanity issue, thus waiving the statutory provision placing the burden on the prosecution.

The experimentation with the ALI test led the Wisconsin legislature to repeal the just-mentioned provision, and to adopt the following ALI insanity defense:

> (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacked substantial capacity either to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law.
>
> (2) As used in this chapter, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.
>
> (3) Mental disease or defect excluding responsibility is an affirmative defense which the defendant must establish to a reasonable certainty by the greater weight of the credible evidence.

Wis.Stats. § 971.15. *See* Model Penal Code §§ 4.01, 4.03.

### B. The Wisconsin Experience with Bifurcated Criminal Trials: Insanity and Intent

For most of the Nineteenth Century, a plea of not guilty by reason of insanity was tried simultaneously with a plea of not guilty in Wisconsin. *See, e.g., State v. Wilner,* 40 Wis. 304 (1876). In 1878, however, the Wisconsin legislature enacted a scheme providing for a bifurcated trial in which the insanity issue was tried first. Wis.Stats. §§ 4697–4699 (1878). If the jury found the defendant to be sane beyond a reasonable doubt, the guilt phase of the trial commenced, during which proof of insanity was

inadmissible. *Id.* § 4699. This procedure, upheld against constitutional attack in *Bennett v. State,* 57 Wis. 69, 14 N.W. 912 (1883), was enacted because of a belief that "the issue of insanity was difficult of determination and should not be further complicated and confused with the evidence on the issue of guilt." *State ex rel. La Follette v. Raskin,* 34 Wis.2d 607, 616, 150 N.W.2d 318, 323 (1967) (citation omitted). In the following years, the Wisconsin legislature twice amended this statute, but ultimately abandoned the bifurcation procedure altogether in 1911 and returned to the practice of trying the issues of guilt and insanity simultaneously. *Id.* at 616–18, 150 N.W.2d at 323–24.

The statutory requirement of trying the issues simultaneously was itself challenged as unconstitutional on the ground that psychiatric testimony would disclose inculpatory statements made during the compulsory mental examination which accompanies an insanity plea. The Wisconsin Supreme Court held the unitary trial unconstitutional under such circumstances, reasoning that a complete mental examination would often require eliciting any inculpatory information that exists, and that the "admissions and statements made by defendant to the medical expert once heard by the jury cannot effectively be erased from their minds and limited to the issue of insanity." *Id.* at 625, 150 N.W.2d at 327. The court, however, reaffirmed an earlier decision upholding the general constitutional validity of the compulsory mental examination, and determined that the solution to the self-incrimination problem was not to restrict the scope of expert testimony during the trial, but rather to permit the defendant to demand a bifurcated trial in which the jury would first render a verdict on the guilt of the accused before any evidence would be received on the insanity issue and after a guilty verdict the issue of the defendant's sanity at the time of the crime could be considered by the jury. *Id.* at 627, 150 N.W.2d at 328.

In a series of decisions under the regime of *Raskin* and *Shoffner,* the Wisconsin Supreme Court held that evidence of a criminal defendant's mental illness was inadmissible in the guilt portion of a bifurcated trial. *Curl v. State,* 40 Wis.2d 474, 162 N.W.2d 77 (1968), *cert. denied,* 394 U.S. 1004, 89 S.Ct. 1601, 22 L.Ed.2d 781 (1969) (upholding exclusion of proffered testimony by defendant concerning his past treatment for schizophrenia) (overruling contrary statements in *Hempton v. State,* 111 Wis. 127, 135, 86 N.W. 596, 598 (1901)); *State v. Hebard,* 50 Wis.2d 408, 184 N.W.2d 156 (1971) (upholding exclusion of psychiatric testimony offered to show that defendant, who shot two parents and their three children in the heads at close range with a high caliber gun, lacked the ability to form the mental purpose to take the life of a human being); *State v. Anderson,* 51 Wis.2d 557, 187 N.W.2d 335 (1971) (upholding refusal to instruct on lesser included offense of second-degree murder and refusing to grant a new trial to permit defendant to introduce psychiatric testimony calling into question her capacity to form an intent to kill in a case where testimony established that after a fight with the victim, defendant obtained a knife, returned to the scene of the fight and stated "I'll kill this bitch," proceeded to stab victim nine times in the neck, chest, back and arms and then said "I hope the bitch dies."); *Sprague v. State,* 52 Wis.2d 89, 187 N.W.2d 784 (1971) (upholding exclusion of evidence concerning defendant's history of epilepsy). These cases emphasized that permitting such evidence during the guilt phase of the trial would undermine the bifurcation of the issues of guilt and insanity, observed that such evidence might result in the acquittal and unconditional release of dangerous individuals suffering from pathological mental illness, indicated that mental illness is either a complete defense under the applicable test for insanity or no defense at all, rejected the concept of diminished responsibility, and implied that such evidence was irrelevant on the issues presented during the guilt portion of the trial.

Apparently as a result of *Raskin* and its progeny, the Wisconsin legislature decided to enact a statutory scheme for bifurcating criminal trials in cases where the insanity defense was raised. Since 1970, Wisconsin

statutory law has required that when a defendant couples pleas of not guilty and not guilty by reason of mental disease or defect,

> there shall be a separation of the issues with a sequential order of proof before the same jury in a continuous trial. The guilt issue shall be heard first and then the issue of the defendant's mental responsibility. The jury shall be informed of the 2 pleas and that a verdict will be taken upon the plea of not guilty before the introduction of evidence on the plea of not guilty by reason of mental disease or defect. This section does not apply to cases tried before the court without a jury.

Wis.Stats. § 971.175. Concomitantly, the statute declares inadmissible statements made by a defendant during a compulsory mental examination on any issue other than the defendant's mental condition, *id.* § 971.-18, and provides that an expert witness testifying about the defendant's mental condition may be cross-examined on any matter bearing on the validity of his opinion, *id.* 971.16(4). Moreover, in accord with *Esser's* analysis of the permissible forms of psychiatric testimony, the statute permits testimony in the form of an opinion on the ultimate issue of insanity. *Id.*

Contemporaneously with the adoption of the foregoing provisions, the legislature adopted the ALI test of insanity, placed the burden of persuasion on the defendant regarding that issue, but did not adopt the ALI's recommended provision stating that "[e]vidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did or did not have a state of mind which is an element of the offense." Model Penal Code § 4.02(1).

Thus, the new statutory scheme not only eliminated the choice the criminal defendant possessed under *Raskin* to opt for a bifurcated trial—a bifurcated trial was now mandatory if the defendant wished both to contest his guilt apart from his insanity and to assert his insanity as a defense, but further, the defendant no longer had the option he possessed under *Shoffner* to elect the *Esser (M'Naghten)* test, under which

the state had to prove sanity beyond a reasonable doubt.

Against this common and statutory law backdrop, the Wisconsin Supreme Court interpreted Wis.Stats. § 971.175's requirement of a separation of the issues of guilt and insanity as rendering testimony concerning a defendant's mental illness inadmissible on the question of intent. *State v. Anderson, supra,* 51 Wis.2d at 564, 187 N.W.2d at 339 (dictum). The first Wisconsin Supreme Court case to apply this principle to a case tried under the new statutory scheme apparently was petitioner Muench's appeal. *See supra* at 1127–1128. In *Hughes v. State,* 68 Wis.2d 159, 227 N.W.2d 911 (1975), the court confronted the issue once again. Hughes was charged with first-degree murder and withdrew an insanity plea just before the trial. The prosecution was granted a motion in limine to prohibit Hughes from introducing psychiatric testimony that he suffered from an abnormal mental condition (an antisocial personality) which prevented him from forming an intent to kill. Hughes offered no defense as a result of this ruling, and argued that the exclusion of the evidence was error, since the testimony was relevant to rebut the presumption that a person intends the natural and probable consequences of his acts. Relying on *Curl, Hebard, Anderson,* and *Muench,* the court rejected Hughes' contention, concluding that in the absence of a plea of insanity, the defendant "was not entitled to present testimony as to his mental condition on the issue of his intent at the time of the shooting. Therefore, it was not error for the trial court to refuse to permit the testimony of the psychiatrist." *Id.* at 165, 227 N.W.2d at 914.

*C. Hughes and Steele: The Admissibility Issue Analyzed From Two Different Perspectives*

Hughes successfully petitioned for a writ of habeas corpus and this court affirmed the judgment granting the writ. *Hughes v. Mathews,* 576 F.2d 1250 (7th Cir.), *cert. dismissed sub nom., Israel v. Hughes,* 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978) (*aff'g* 440 F.Supp. 1272 (E.D.Wis.1977)).

This court based its decision on two alternative grounds, only the second of which is argued in this case. We held that the exclusion of the psychiatric evidence offered to show that Hughes lacked the capacity to form the specific intent to kill was constitutionally infirm, as a violation of a criminal defendant's right to present evidence under *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), and *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Specifically, we followed Justice Harlan's position that a "defendant's right to present evidence is violated where 'the State has recognized as relevant and competent the testimony of this type of witness, but has arbitrarily barred its use by the defendant.'" 576 F.2d at 1256 (quoting *Washington v. Texas, supra,* 388 U.S. at 25, 87 S.Ct. at 1926 (Harlan, J., concurring)). We recognized that state law determines the relevance and competence of evidence, 576 F.2d at 1256 n. 13, and we first considered the relevance of psychiatric testimony regarding the issue of intent under Wisconsin law. Noting that Wis.Stats. § 904.01 defines relevant evidence as that which is material and probative, we thought that psychiatric testimony regarding a defendant's mental state "would pertain to and have some bearing" on distinguishing between the intent requirements of first-degree and second-degree murder. *Id.* at 1256. We based this conclusion on (1) statements in *Hebard* that proof of insanity is not proof that the defendant lacks the capacity to intend, (2) the fact that Wisconsin viewed psychiatric evidence highly relevant on the issue of competency to stand trial, and (3) *King v. State,* 75 Wis.2d 26, 248 N.W.2d 458 (1977), in which the defendant was permitted to introduce psychiatric testimony as character evidence. We recognized, however, that *Curl* suggested a contrary conclusion on the relevance question, but concluded that *Curl's* objections to psychiatric testimony were based on the competency of such evidence and public policy considerations. 576 F.2d at 1257 n. 18.

On the issue of competency under state law, we recognized that *Curl* stated that the reason for excluding psychiatric testimony on the intent issue was a disbelief in the ability of psychiatry to define degrees of mental abnormality less than insanity, and we "question[ed] the validity of a system which views psychiatric testimony as trustworthy evidence as to whether a person is mentally capable of appreciating the wrongfulness of his conduct but untrustworthy to express an opinion regarding a person's mental capacity to form specific intent to kill when such testimony is the only relevant evidence available." *Id.* at 1257. However, we did not pass on that question; instead we interpreted *Curl* "as stating that the true reason for excluding psychiatric evidence on the issue of intent in Wisconsin courts is the fear that persons who are legally sane will escape punishment," and expressed the view that "[t]his is more of a justification for excluding competent evidence than a reason why the evidence is incompetent." *Id.* at 1258. We then concluded that "psychiatric testimony is generally considered competent evidence in Wisconsin" because of its use on the questions of insanity and competence to stand trial, and the fact that .psychiatric diagnosis satisfies the general test for admissibility of scientific evidence. *Id.*

Having thus determined that psychiatric testimony was relevant and competent under state law, we acknowledged that the right of a defendant to present such evidence may "'bow to accommodate other legitimate interests in the criminal trial process,'" and proceeded to "closely examine[]" the "two main justifications" for the Wisconsin practice. *Id.* (citation omitted). The first justification—the fear that the guilty would be absolved of criminal liability—was considered "unpersuasive in the present case where the testimony was offered only to show that a second-degree murder conviction was proper," but we expressly reserved judgment on the sufficiency of this justification in other circumstances. *Id.* Regarding the second justification—ensuring the integrity of Wisconsin's bifurcated trial system—"confining ourselves to the facts of [Hughes'] case" we noted that no bifurcated trial occurred, and that Hughes had "admitted the act" and argued only he lacked intent to kill. We

thus concluded that the state's second justification (based on the concerns about duplicative evidence, and self-incrimination concerns) was "not applicable here." *Id.* at 1257.

In relevant part, we concluded our opinion as follows:

In conclusion, we emphasize first what we have not done. We have not sought to impose a "diminished responsibility" defense for emotional problems upon Wisconsin. The fashioning of such affirmative defenses involves the type of "subtle balancing of society's interests against those of the accused [which has] been left to the legislative branch." Nor have we attempted to further "constitutionalize" the law of evidence by constructing a constitutional right to introduce psychiatric testimony.... We have ... recognized the due process right of the defendant to present relevant and competent evidence in the absence of valid state justification for excluding such evidence. Upon the particular facts of this case, we find Wisconsin's justifications to be inapplicable.

*Id.* (citations omitted).

In *Schimmel v. State,* 84 Wis.2d 287, 267 N.W.2d 271 (1978), the Wisconsin Supreme Court was once again confronted with a challenge to the exclusion of psychiatric testimony in the guilt portion of a bifurcated first-degree murder trial. The court delayed decision in the case pending our decision in *Hughes, id.* at 299, 267 N.W.2d at 276. The court interpreted our decision in *Hughes* as applicable to the case before it and as requiring the "admission of competent psychiatric testimony during the guilt phase of a bifurcated trial relevant to the defendant's state of mind at the time of the crime." *Id.* at 302, 267 N.W.2d at 278. Hence, the court overruled previous decisions (*e.g. Curl, Hebard, Sprague, Anderson, Muench,* and *Hughes*) to the extent they were inconsistent with *Schimmel.*

The Wisconsin Supreme Court faced yet another challenge to the exclusion of psychiatric testimony during the guilt phase of a bifurcated first-degree murder trial in *Steele v. State,* 97 Wis.2d 72, 294 N.W.2d 2 (1980). Steele was tried in 1974 for the murder of his estranged wife. He stipulated prior to trial that he had purchased a revolver and ammunition on the morning of the killing, went to his estranged wife's residence, fired six bullets into his wife, and that she died almost immediately. Steele's sole defense in the guilt portion of the trial was that he did not intend to kill his estranged wife.

The testimony at trial revealed that Steele was upset about his separation from his wife, Joan, who was released from a psychiatric hospital in late January 1974, and took up residence with her child at a county foster home. When Steele learned this from a social worker, Frost, he became angry and threatened that if Joan stayed there, "he would get a gun and blow her head off." *Id.* at 77, 294 N.W.2d at 4. On February 4, Steele and his wife met with a marriage counselor, who recommended a divorce. After the meeting, an angry Steele struck his wife, knocking her to the ground, and later that day he told Frost "You can't guard [Joan] all the time. I'll get her sooner or later." *Id.* at 78, 294 N.W.2d at 4. The next day a county judge awarded custody of the child to Joan, prompting Steele to once again threaten Joan's life to Foster, though he later recanted the threatening statements, attributing them to alcohol. He also went to see a psychiatric social worker, Stamberger, to whom he expressed regret about striking Joan and further recanted his threats. On February 7, the county judge refused Steele's request to visit his child on the child's birthday. Steele, a cab driver, picked up a customer shortly thereafter; the customer testified that Steele drove recklessly and looked "wild." *Id.*

Steele was distraught over the ensuing weekend. Monday morning, he visited Stamberger, who testified that Steele was very upset, cried, and looked tired. Steele next visited the county judge, unsuccessfully attempting to gain permission to visit the child. Then he purchased the revolver and went to Joan's residence, where the two argued. The owner of the foster home became alarmed, and left to call the police.

As the police arrived on the scene, they heard gunshots. In the house they found Joan lying dead on the floor and Steele standing next to her, gun in hand. One officer testified that Steele appeared as though he was trying to figure out what he had done. The other officer testified that Steele appeared to be "realizing" what he had done. *Id.* at 79, 294 N.W.2d at 5. Also admitted into evidence was extensive evidence about Steele's psychiatric and personal history, including his previous stays in mental health facilities. The evidence, admitted without objection, was introduced "to cast doubt upon the defendant's intent to kill." *Id.*

The defense also attempted to examine several expert witnesses, including Stamberger, the psychiatric social worker, for the purpose of eliciting their opinions about Steele's capacity to form an intent to kill his wife. The trial court ruled the testimony inadmissible, applying "the then clear rule that psychiatric testimony concerning the defendant's capacity to form the specific intent to kill required for first degree murder was inadmissible in the first, or guilt, phase of a bifurcated trial." *Id.* at 80, 294 N.W.2d at 5.

The Wisconsin Supreme Court, recognizing that this rule had been abandoned in *Schimmel,* reassessed its decision in *Schimmel* and expressly overruled it, stating that *Schimmel* incorrectly extended the *Hughes* rationale to bifurcated trials and reaffirming the *Curl* line of cases holding that expert opinion evidence offered to show that a defendant lacked the capacity to form an intent was inadmissible in the guilt phase of a bifurcated trial. *Id.* at 81–85, 93, 294 N.W.2d at 7–8, 14. Moreover, in dictum the court stated that the exclusion of such evidence is also proper in a single phase trial. *Id.* at 97, 294 N.W.2d at 14.

In reaching the conclusion that *Schimmel* erroneously extended *Hughes* to requiring the admission of psychiatric testimony regarding intent in the guilt phase of a bifurcated trial, the court examined the history of the bifurcation procedure and the *Curl* line of reasoning to demonstrate a sufficient state justification for its exclusionary rule in the context of bifurcated trials. *Id.*

at 85–90, 294 N.W.2d at 8–11. The court then examined our conclusion in *Hughes* that such expert testimony was relevant and competent under Wisconsin law, canvassing much of the same authority about the question as we had in *Hughes,* and other authorities as well. *Id.* at 92–97, 294 N.W.2d at 11–13. The court stated that while it recognized the utility of psychiatric testimony regarding some questions, such as insanity, it had serious doubts about the use of such testimony on the question of criminal intent. The different forms of *mens rea* upon which the criminal law distinguishes certain offenses from one another "requires a fine tuning of an entirely different nature than that required for the admission of evidence on the general question of insanity . . . ." *Id.* at 96, 294 N.W.2d at 13. The court doubted whether psychiatry could contribute trustworthy, scientifically-substantiated expert knowledge concerning an individual's capacity to form an intent, noted the tendency of juries to place great reliance on such experts, and doubted the efficacy of cross-examination on this question. *Id.* at 94, 95, 294 N.W.2d at 12–13. It concluded that "under the present state of the law, the proffered evidence is neither competent, relevant, nor probative for the purpose asserted in the instant case," *Id.* at 97, 294 N.W.2d at 13, emphasizing that this conclusion provided a basis for excluding such testimony independent of its concerns for maintaining its bifurcation scheme. *Id.* at 97–98, 294 N.W.2d at 14.

Justice Abrahamson dissented in *Steele,* arguing that expert opinion testimony on the issue of a defendant's capacity to form a specific intent should not be automatically excluded, but rather, the trial court should determine such questions on a case by case basis. She also interpreted the majority opinion as adopting a rule automatically excluding such testimony in a single stage trial and viewed that decision as being in direct conflict with our decision in *Hughes.* *Id.* at 99–100, 294 N.W.2d at 14–15.

Some arguable doubts about the scope of the *Steele* holding were eliminated in *State v. Dalton,* 98 Wis.2d 725, 298 N.W.2d 398 (1980). There the court noted that the

statement in *Steele* regarding the exclusion of psychiatric evidence during a trial in which no insanity plea is raised was dictum, but was nevertheless an "unmistakable direction" to lower courts. *Id.* at 728, 298 N.W.2d at 399. Moreover, in *Dalton,* the court took pains to emphasize that in upholding the exclusion of certain proffered psychiatric testimony in the case before it, it was *not* applying the *Steele* exclusionary rule; instead, it was specifically evaluating the evidence under Wis.Stats. § 907.02. Its evaluation of the proffered evidence is instructive. One defense psychiatrist was withdrawn as a witness when he testified in an offer of proof that "he was not aware of anything in the field of psychiatry which substantiated the theory that a psychiatrist could express an opinion on whether or not a person had the intent to kill at the time he committed the homicide." *Id.* at 729, 298 N.W.2d at 400. Another defense psychiatrist was called to testify that defendant was a sociopath and did not form an intent to kill. He candidly stated that he did not think that the defendant's abnormal personality, "per se, would negative his having an intent," but went on to say that due to clinical experience, he thought he possessed a greater understanding of human motivations than the average layperson. The court rejected his proffered testimony, calling the foundation for it a "self-qualification of the psychiatrist as a 'super juror.'" *Id.* at 730, 298 N.W.2d at 400. The court held that scientific knowledge did not form the basis of his proffered opinion, which was merely a lay opinion. The vice of such testimony, the court observed, "is that it is clothed with the seeming scientific knowledge of an expert and thus deceives the jury into believing that it is entitled to deference and consideration which is unsupported and unwarranted." *Id.* at 731, 298 N.W.2d at 401.

## V

While petitioners contend that they have been deprived of their constitutional right to present evidence in their defense of a criminal charge against them, at the outset it must be recognized that they were permitted to introduce psychiatric testimony regarding their mental abnormalities in defense of the charges against them. Indeed, Worthing introduced lengthy psychiatric testimony in his defense. What petitioners were not permitted to do was to introduce psychiatric testimony for a certain specified purpose: they were not permitted to introduce such testimony for the purpose of establishing that they lacked the capacity to form an intent to kill because of a mental disease or defect.

The question the instant case presents is not the question we decided in *Hughes.* In *Hughes* we determined that when evidence is considered relevant and competent under state law, a criminal defendant may not be precluded from presenting it in his defense if the *policy* considerations advanced in support of exclusion are inapplicable in the context of the situation. We took pains in *Hughes* to point out that we were not seeking to constitutionalize the law of evidence nor to impose a diminished responsibility doctrine on Wisconsin. Yet that is just what petitioners in the instant case seek: they argue that they have a constitutional right to present psychiatric evidence of their abnormal personalities in order to prove that they lacked the capacity to form an intent to kill. This contention is not a new one. In fact, it has been rejected by the Supreme Court of the United States on several occasions.

### Applicable Supreme Court Authority

In 1928, one Joe Troche was charged with murder in California. He pled not guilty and not guilty by reason of insanity, as permitted under California Penal Code § 1016 (1927). A bifurcated trial on the two pleas was mandated. *Id.* § 1026. During a trial on a not guilty plea, a defendant was conclusively presumed to be sane; this was true both if a defendant entered only a not guilty plea, *id.* § 1016, and if a defendant, like Troche, entered both not guilty and insanity pleas, *id.* § 1026. Moreover, all matters of fact tending to establish an insanity defense were inadmissible during a trial on a not guilty plea. *Id.* § 1020.

Troche was convicted of murder under this scheme in a bifurcated trial and sentenced to be hanged. Evidence of his mental illness was excluded from the guilt portion of his trial, and the jury was instructed that in rendering their verdict on the not guilty plea, they were to presume conclusively that Troche was sane at the time the killing occurred.

The California Supreme Court affirmed Troche's conviction and death sentence, upholding the statutory scheme against federal constitutional attack. *People v. Troche,* 206 Cal. 35, 273 P. 767 (1928). In holding that the trial court properly excluded all evidence about Troche's mental illness on the trial of the general issue of guilt, the court observed that the "doctrine of 'partial sanity'" espoused by some commentators had never been part of California law, and proceeded to quote from many cases which explain that "insanity" (*i.e.* mental illness) is either a complete defense or no defense at all, that there is no middle ground on this point, and that there is no degree of insanity sufficient to acquit for murder but not of manslaughter. 273 P. at 772. The court thus rejected Troche's argument that evidence of mental illness should be admissible for purposes of showing a lack of criminal intent or distinguishing between degrees of murder, *compare id.* with 273 P. at 769–70, and concluded:

> It follows, therefore, that any evidence tending to establish the insanity of the defendant under his plea of not guilty by reason of insanity at the time of the commission of the homicide, other than evidence of the immediate circumstances of the offense, would have been irrelevant and immaterial on the trial of the general issue as to the guilt or innocence of the defendant raised by the general plea of not guilty. As the statute accorded the defendant his full right, and ample opportunity to submit to a jury his plea of insanity at the time of the commission of the offense, in excuse of his act and as a reason why no penalty of the law should be visited upon him, it follows that

the trial court correctly excluded the evidence on the trial of the general issue. *Id.*

The California Supreme Court held that §§ 1016, 1020, and 1026 "in no way violate the 'due process' provisions of either the federal or state constitution." 273 P. at 770.

Troche appealed his conviction to the United States Supreme Court, contending, inter alia, that the California Supreme Court decision upholding §§ 1016, 1020, and 1026 against a due process challenge was erroneous. Appellant's Opening Brief at 10, incorporating by reference Appellant's Assignment of Errors appearing in Transcript of Record at 127, *Troche v. California,* 280 U.S. 524, 50 S.Ct. 87, 74 L.Ed. 592 (1929) (per curiam) (Docket No. 247, October Term, 1929). In particular, Troche challenged as violative of due process the presumption of sanity and the exclusion of evidence of insanity in the guilt phase of his trial, contending that this "conclusively presumes one of the main elements of a crime against the defendant, said element being that of intent." Appellant's Statement of Points on Which Appellant Intends to Rely appearing in Transcript of Record at 136. In his brief, he quoted the following language from *Manley v. Georgia,* 279 U.S. 1, 6, 49 S.Ct. 215, 217, 73 L.Ed. 575 (1929), in support of his contention: " 'A statute creating a presumption that is arbitrary or that operates to deny a fair opportunity to repeal it violates the due process clause of the [Fourteenth] [A]mendment.' " Appellant's Opening Brief at 11. He primarily relied, however, on the dissenting opinion rendered in his case before the California Supreme Court, which was reprinted in its entirety in his brief. The dissent pointed out that during the first phase of the trial, not merely the act is an issue, but all of the essential elements of the crime are at issue. He argued that the "plea of not guilty necessarily includes within it the element of insanity," maintaining:

> If the jury, in ascertaining the intent of the defendant, may not consider the evidence of his insanity, it must follow that

the Legislature has the power to dispense entirely with the element of intent. Yes, more is true: If the jury may not, before assessing guilt to the defendant, consider the fact that he is insane, not only may criminal intent be dispensed with, but the time-honored and almost sacred presumption of innocence may be set at naught by the lawmaking power.

273 P. at 775. The dissent also quoted many state cases and the Supreme Court's decision in *Mobile, J. & K.C.R. Co. v. Turnipseed,* 219 U.S. 35, 42–43, 31 S.Ct. 136, 137–138, 55 L.Ed. 78 (1910), in support of the well established proposition that "to conclusively presume any ingredient of crime is to clash squarely with the presumption of innocence." 273 P. at 778. He rejected the majority's characterization of the issue, stating that the "question of the degree of insanity that shall constitute a defense of crime is not here involved and no reason exists to question the established rule of this subject." *Id.*

The respondent's brief observed that "[o]f late years ... the abuse of the defense of insanity has been loudly proclaimed ... tending to show an urgent need of reform...." Respondent's Brief at 8–9. The California system was argued to be such a reform, and while the brief raises several novel if not peculiar arguments, it did recognize that *Troche* was contending "that as malice and premeditation are elements of the crime of murder, one charged with murder should be permitted to defend by showing that those elements did not exist by reason of his mental incapacity to bear malice or premeditate." *Id.* at 18. Respondent attached an appendix which quoted from numerous cases stating, as had the California Supreme Court, that the law recognizes no degrees of insanity, that it is either a complete defense or no defense at all, and that if a person is sane enough to form the *mens rea* for manslaughter or second degree murder, he is sane enough to form an intent to kill. *Id.* at 27–37.

The United States Supreme Court dismissed Troche's appeal "for want of a substantial federal question." *Troche v. California,* 280 U.S. 524, 50 S.Ct. 87, 74 L.Ed. 592 (1929) (per curiam). That disposition of the case is, of course, a decision on the merits of the questions presented in the appeal; it is a holding that the federal questions are insubstantial and is binding on this court unless subsequent Supreme Court decisions indicate otherwise. *Hicks v. Miranda,* 422 U.S. 332, 343–45, 95 S.Ct. 2281, 2288–90, 45 L.Ed.2d 223 (1975).

Having examined the California Supreme Court opinion affirming Troche's conviction and his appellate papers in the United States Supreme Court, we do not believe the reach and content of the *Troche* decision is in doubt, *see generally Hicks v. Miranda, supra,* 422 U.S. at 345 n. 14, 95 S.Ct. at 2290 n. 14; Note, *Summary Disposition of Supreme Court Appeals: The Significance of Limited Discretion and a Theory of Limited Precedent,* 52 B.U.L.Rev. 373, 411–17 (1972). It would appear that petitioners' underlying arguments in the instant case are anything but new, and that the Supreme Court has deemed them insufficient to state a deprivation of due process. We must therefore ascertain whether the *Troche* decision has been undermined by subsequent Supreme Court decisions.

The Supreme Court's decision in *Troche* has only been cited once by a federal court, so far as we can ascertain. In *Coleman v. California,* 317 U.S. 596, 63 S.Ct. 162, 87 L.Ed. 487 (1942) (per curiam), the Supreme Court itself cited the case as authority in dismissing for want of a substantial federal question an appeal from *People v. Coleman,* 20 Cal.2d 399, 126 P.2d 349 (1942). Coleman was also condemned to death in a bifurcated trial. Coleman's theory in the California Supreme Court was essentially the same as Troche's, though more refined: that in a trial on a plea of not guilty the jury should be permitted to consider "mental abnormalities not amounting to a complete defense of insanity, but which still may show the lack of capacity to form the specific intent to commit first degree murder ...." 126 P.2d at 353. The court noted that this argument and its corollaries were not new, repeated the statement that insanity is either a complete defense or no defense at all, stated it would be "inhumane" to convict an insane person on a lesser included offense,

stated that intent must be manifested by surrounding circumstances, and quoted an earlier case which noted the tendency of such evidence to confuse jurors with matters having no bearing on guilt.

What remains of Coleman's pro se papers on appeal, copies of which we obtained from the National Archives, indicates Coleman relied upon the same theory in the United States Supreme Court. *See* Statement of Points To Be Relied Upon and Designation of Parts of Record to Be Printed Pursuant to Supreme Court Rule 13, Par. IX, dated Oct. 28, 1942, *Coleman v. California, supra* (Docket No. 491, October Term, 1942). Given the Supreme Court's dismissal of Coleman's appeal for want of a substantial federal question and its citation of *Troche* in support of the dismissal, it seems reasonably clear that the exclusion of evidence of a defendant's mental abnormalities on the issue of intent was deemed a constitutionally acceptable practice by the Supreme Court.

Four years after the *Coleman* decision, *Fisher v. United States,* 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946), was decided. As we noted in *Hughes,* 576 F.2d at 1256 n. 12, *Fisher* did not directly deal with the precise issue of the exclusion of psychiatric evidence, for in Fisher's unitary trial, the defendant was permitted to introduce all psychiatric testimony offered in support of his insanity defense. However, in light of *Troche* and *Coleman,* not considered by us in *Hughes,* certain statements in *Fisher* take on added significance.

*Fisher* held that a defendant in a first-degree murder case was not entitled to an instruction under the law of the District of Columbia that the jury should consider his abnormal personality in determining the issue of intent. After reviewing the evidence in the trial, the Supreme Court stated:

> [T]here was sufficient evidence to support a verdict of murder in the first degree, if petitioner was a normal man in his mental and emotional characteristics. But the defense takes the position that the petitioner is fairly entitled to be judged as to deliberation and premeditation, not by a theoretical normality but by his own personal traits. In view of the status of the defense of partial responsibility in the District and the nation no contention is or could be made of the denial of due process.

328 U.S. at 466, 66 S.Ct. at 1320 (citation omitted). The court then considered Fisher's argument that mental deficiency short of legal insanity

> should be declared by this Court to be a rel[e]vant factor in determining whether an accused is guilty of murder in the first or second degree, upon which an instruction should be given, as requested. It is pointed out that the courts of certain states have adopted this theory. Others have rejected it.

*Id.* at 473, 66 S.Ct. at 1323 (footnote omitted, citing, inter alia, California Supreme Court decision in *Troche* as an example of a court rejecting the theory). Rejecting the argument that since evidence of intoxication may be used to establish an incapacity to deliberately premeditate and hence reduce the crime to second-degree murder, the court must deduce that evidence of mental disease may also reduce the crime to a lesser degree, and surveying the disagreement about the doctrine of "partial responsibility," the Court concluded:

> It may be that psychiatry has now reached a position of certainty in its diagnosis and prognosis which will induce Congress to enact the rule of responsibility for crime for which petitioner contends. For this Court to force the District of Columbia to adopt such a requirement for criminal trials would involve a fundamental change in the common law theory of responsibility.

> We express no opinion upon whether the theory for which petitioner contends should or should not be made the law of the District of Columbia. Such a radical departure from common law concepts is more properly a subject for the exercise of legislative power or at least for the discretion of the courts of the District. The administration of criminal law in matters not affected by Constitutional

limitations or a general federal law is a matter peculiarly of local concern.

\* \* \* \* \* \*

Matters relating to law enforcement in the District are entrusted to the courts of the District. Our policy is not to interfere with the local rules of law which they fashion, save in exceptional situations where egregious error has been committed.

Where the choice of the Court of Appeals of the District of Columbia in local matters between conflicting legal conclusions seems nicely balanced, we do not interfere.

*Id.* at 476, 66 S.Ct. at 1324–1325.

The major dissenting opinion in *Fisher,* emphasizing the fact that Fisher had been sentenced to death based on the jury's implicit finding of premeditation, argued that the majority was incorrect in holding that mental abnormality insufficient to constitute an insanity defense could not be considered by the jury on the premeditation question. It admitted that it was "undeniably difficult ... to determine with any high degree of certainty" whether one's mental abnormality renders him incapable of premeditation, largely because of the limited scope of psychiatric knowledge of mental disease. *Id.* at 493, 66 S.Ct. at 1333. Nevertheless, it found the intoxication analogy compelling, argued that psychiatric testimony on the issue would assist the jury "however inexact and incomplete that assistance may presently be," and rejected the majority's position that the question was a matter for the Congress or the local court, maintaining that "Congress has already spoken by making the distinction between first and second degree murder turn upon the existence of deliberation and premeditation." *Id.* at 493, 66 S.Ct. at 1333.

Justice Frankfurter, while joining in the foregoing dissent, also dissented separately, and lamented the "preoccupation" with the "alluring problems of psychiatry" which manifested itself at all stages of the proceedings, believing that the injection of that issue into the case "diverted attention from the more obvious and conventional but controlling inquiry regarding the absence or presence of the requisite premeditation, under the circumstances of this case." *Id.* at 484–85, 66 S.Ct. at 1328–29. Moreover, he observed that the theory advanced by the defendant "did not go to this issue of premeditation unambiguously but in an awkward and oblique way...." *Id.* at 485, 66 S.Ct. at 1329.

In our view, *Troche, Coleman,* and *Fisher* are dispositive of the question presented in the instant case. *Troche* and *Coleman* deemed petitioners' due process arguments as insubstantial, and *Fisher* carefully considered the same arguments and did not even find them sufficiently compelling to justify an exercise of the Court's supervisory authority over the District of Columbia courts. A theory that the Supreme Court has twice refused to impose upon the state of California, albeit in summary decisions, and has refused to impose upon the District of Columbia courts under its supervisory powers is not one that this lower federal court will impose on the state of Wisconsin as a matter of federal constitutional due process.

The parties were evidently unaware of *Troche* and *Coleman;* however, petitioners do attempt to distinguish *Fisher* in two ways. First, they note that we found *Fisher* inapposite in *Hughes.* In *Hughes,* however, we were, as previously noted, confronted with a different question than that presented here, and in *Hughes,* we did not read *Fisher* in the light of *Troche* and *Coleman.* Second, they point to *State v. Booth,* 284 Or. 615, 588 P.2d 614 (1978), which maintains it is consistent to permit evidence of mental illness offered to negate intent but refuse specifically to instruct the jury that they may use the evidence on that question because general instructions on intent adequately cover the capacity concept. If *Fisher* had merely stated that the diminished capacity theory was implicit in the instructions given and therefore Fisher's instruction was merely duplicative, petitioner's argument would be well taken. But manifestly, *Fisher* stands for no such thing. *Fisher* squarely confronted the substance of the theory; the Court was not quibbling with the proffered instruction on redundan-

cy grounds. The Court recognized that the defendant wanted to be judged on the intent issue on the basis of his own subjective mental limitations, and the Court refused to recognize his right to do so. Under *Fisher,* it seems inescapable that it would have been proper to instruct the jury that the evidence it did in fact hear concerning the defendant's mental illness could not be considered by it in reaching its verdict on the *mens rea* question, but only in its deliberations on the insanity question. Any contrary conclusion would render *Fisher* virtually meaningless, if not disingenuous: petitioners essentially contend that the *Fisher* Court operated from the supposition that the jury did, as a matter of fact, considering the psychiatric evidence before it on the deliberation question, even though the Court had just held under the law that the psychiatric evidence was not a permissible ground upon which to distinguish between first-degree and second-degree murder. We take *Fisher* at its word: it condoned, though did not endorse as the wiser position, the view that mental abnormality short of legal insanity is not a relevant factor in determining whether an accused is guilty of murder in the first or second degree. Moreover, as in *Troche* and *Coleman,* it did so in a case where a man's life turned on the distinction; as in *Troche* and *Coleman,* it did so in a case where the distinction between the degrees of murder turned on the presence of deliberate premeditation, a mental state that is more amenable to expert evaluation than the naked desire to kill required under Wisconsin law; and it did so in a case where considerations of federal-state comity were not even present, but where less weighty concerns with comity obtained.

The passage of time has not brought with it unanimity in recognizing the doctrine of diminished capacity; far from it, the jurisdictions have widely vacillated over the years. *Compare Fisher v. United States, supra,* 328 U.S. at 473 n. 12, 66 S.Ct. at 1323 n. 12 (collecting cases) *with* Annot., 22 A.L.R.3d 1228 (1968) (same) and Lewin, *Psychiatric Evidence in Criminal Cases for Purposes Other Than the Defense of Insanity,* 26 Syracuse L.Rev. 1051, 1105–15 (1977)

(same), *and Pfeiffer v. State,* 44 Md.App. 49, 407 A.2d 354, 358–59, n. 4 (1979) (same), *and State v. Correra,* 430 A.2d 1251, 1257 App. (R.I.1981) (same), Annot. 16 A.L.R.4th 666 (1982) (same). The California experience has been a particularly rocky one: initially rejecting the doctrine, *e.g. People v. Troche, supra; People v. Coleman, supra,* the courts then overruled *Troche* and *Coleman* and adopted it, *People v. Wells,* 33 Cal.2d 330, 202 P.2d 53, 61–70, *cert. denied,* 338 U.S. 836, 70 S.Ct. 43, 94 L.Ed. 510 (1949), and then broadened its sweep considerably, *see, e.g., People v. Ray,* 14 Cal.3d 20, 120 Cal.Rptr. 377, 533 P.2d 1017 (1975), and finally the California legislature abolished the "defense" of diminished capacity, Cal. Penal Code § 28(b) (1983 Supp.), specifically prohibited admitting evidence of mental illness offered to negate the *capacity* to form a requisite *mens rea, id.* § 29, prohibited an expert from testifying whether the defendant had or did not have the requisite *mens rea, id.* § 29, but permitting the court to admit psychiatric testimony on the issue of whether the defendant "actually formed" the requisite *mens rea, id.* § 28(a), in the discretion of the court pursuant to the Evidence Code, *id.* § 28(d). Some courts believe enthusiasm for the doctrine appears to be on the wane, *e.g. State v. Wilcox,* 70 Ohio St.2d 182, 436 N.E.2d 523, 525 (1982). At the very least, it is clear that many jurisdictions still reject the doctrine, and that fact is itself plainly worth considering in determining whether rejection of the doctrine offends due process, *Leland v. Oregon,* 343 U.S. 790, 798, 72 S.Ct. 1002, 1007, 96 L.Ed. 1302 (1952).

Petitioners, of course, claim they are not attempting to impose upon Wisconsin what they call a "diminished responsibility defense," thereby attempting to capitalize on the somewhat misleading nature of that particular label for the doctrine. A distinction can be drawn between the theory advanced by petitioners—admitting evidence of mental illness which is explicitly tied (at least grammatically) to the specific *mens rea* at issue, and a doctrine which might accurately be called diminished responsibility—admitting evidence of mental illness as

a vague and general mitigating factor. *See* Arenella, *The Diminished Capacity and Diminished Responsibility Defenses: Two Children of a Doomed Marriage,* 77 Colum. L.Rev. 827 (1977). However, the courts have used the labels diminished responsibility, diminished capacity, and other nomenclature merely as a shorthand for the proposition that expert evidence of mental abnormalities is admissible on the question of whether the defendant in fact possessed a particular mental state which is an element of the charged offense. *E.g. Bethea v. United States,* 365 A.2d 64, 83–84 n. 41 (D.C.App.1976), *cert. denied,* 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977). *See generally,* W. LaFave & A. Scott, Handbook on Criminal Law § 42 at 325–26 (1972) (calling adoption of the doctrine the "better view"). When a court rejects the doctrine of diminished capacity, it is saying that psychiatric evidence is inadmissible on the *mens rea* issue, as recent cases rejecting the doctrine explain. *State v. Wilcox,* 70 Ohio St.2d 182, 436 N.E.2d 523 (1982); *State v. Edwards,* 420 So.2d 663 (La.1982); *People v. Atkins,* 117 Mich.App. 430, 324 N.W.2d 38 (1982); *Johnson v. State,* 292 Md. 405, 439 A.2d 542 (Md.1982); *State v. Bouwman,* 328 N.W.2d 703 (Minn.1982).

In their attempt to have this court impose the doctrine of diminished capacity on the Wisconsin courts in fact but not in name, petitioners attempt to distinguish the position taken by *Steele* and that taken by the court in *Bethea v. United States, supra.* In *Bethea,* the District of Columbia Court of Appeals expressly rejected the doctrine of diminished responsibility. Petitioners maintain that if *Steele* had done this, the instant case would present a different question. *Steele,* of course, is nothing but a lengthy explication of the reasons for rejecting the doctrine. To avoid the very contention petitioners now make in attempting to cloud the issue, the *Bethea* court stressed the manner in which it was using the terms diminished capacity and diminished responsibility: "to connote the admissibility of expert evidence of the accused's mental abnormalities for the specific purpose of negativing the required *mens rea.*" *Bethea v. United States, supra,* 365

A.2d at 84 n. 41. Since *Steele* and *Bethea* did in fact decide the same question, it is not surprising that *Bethea* is based on the same considerations which motivated *Steele:* that injecting questions about mental abnormalities into a trial on first-degree murder detracts attention from the real issues and has as its basis a theory about culpability which the court is unprepared to accept against the interwoven and delicately crafted fabric of its substantive definition of murder, its view of ·*scienter,* its conception of legal insanity, its assessment of the limitations of jurors, and its evaluation of the state of the developing discipline of psychology.

Recognition of the doctrine turns not only on whether it is believed that the discipline of psychology has reached the point where it can provide meaningful insights into the kinds of mental states which beget criminal culpability, but on other factors as well. The doctrine emerged in large measure to ameliorate the relatively narrow concept of insanity under the *M'Naghten* test, and found its most fertile ground in capital cases, and cases in which the *mens rea* required premeditation. In short, the doctrine emerged from experience as an attempt to fashion a rational and coherent method for society to treat with compassion those among us who operate in the twilight of rationality.

Of course, there is much logic to the doctrine as well, and it is the logic of the doctrine which petitioners emphasize in their attempt to impose it upon Wisconsin as a matter of constitutional law. They challenge *Steele*'s conclusion that psychiatric evidence is irrelevant and incompetent.

An analysis concerning the relevancy of evidence begins by ascertaining the facts which are in issue as a result of the substantive law and the pleadings. Evidence which establishes a proposition not in issue is said to be immaterial—*i.e.,* the fact wished to be established is not an issue in the case under the substantive law.

Petitioners' argument regarding the materiality of the proffered psychiatric testimony is straightforward. Whether they ac-

tually committed their homicidal acts with the mental purpose of ending a human life was a fact in issue. Logically, their "capacity" to "form" that intention is a fact in issue, for if they lacked the capacity to form the intent, then they did not actually form that intent. Hence, their capacity to form an intent to kill is a fact in issue, and evidence standing for that proposition is material.

It is naturally tautological that one who lacks the capacity to do something could not have done that something. Thus conceptualized, the process of cognition is described in essentially, physiological terms. "Forming" an "intention" can be likened to "performing" an "action," and just as evidence of a physical handicap which rendered a person incapable of performing a particular action would be material in a case where the person is accused of performing that action, it would logically seem that evidence of a mental handicap which rendered a person incapable of forming a particular intention would be material where the person is accused of forming that intention.

If specific types of intentions were as discrete as particular types of actions; if one's mental abilities were as demonstrable as one's physical abilities; if the relationship between one's mental handicaps and a specific intent were as identifiable as the relationship between one's physical handicaps and a specific physical movement; and if one formed an intention the way one performs an action, the analogy would be compelling, but it is not.

The essential flaw in petitioners' argument is that the basic fact which they wish to establish is that they suffered from a personality disorder. It is not disputed that experts in psychology are competent to testify regarding that basic fact. What is the dispute—indeed, the entire debate over the doctrine of diminished capacity has as its focal point—is whether a personality disorder is probative of the defendant's capacity to form an intent to kill. Petitioners' experts contended that personality disorders rendered them unable to form such an intent. That is, their experts contended that the fact of their personality disorders was a material issue in their cases because the fact was probative of whether they were capable of entertaining a mental state in issue. In short, petitioners essentially maintain that the psychiatric testimony they proffered is relevant because their witnesses said so. The proposition does not survive its statement.

Petitioners' other arguments, such as the analogy between recognizing an intoxication defense and recognizing the doctrine of diminished capacity based on innate personality disorders, have been considered and found uncompelling by *Fisher,* not to mention other courts, *e.g., Bethea v. United States, supra,* 365 A.2d at 88, and we need not enter the debate ourselves, for our task is not to determine whether the course Wisconsin has chosen is wise, but rather, whether it is so without legal foundation that it offends due process.

In closing, we observe that the only other circuit to address the constitutional challenge we confront here is in accord with our decision. *Wahrlich v. Arizona,* 479 F.2d 1137 (9th Cir.) (per curiam), *cert. denied,* 414 U.S. 1011, 94 S.Ct. 375, 38 L.Ed.2d 249 (1973). Petitioners' attempt to distinguish *Wahrlich* is based on the erroneous supposition that the decision in *State v. Shaw,* 106 Ariz. 103, 471 P.2d 715 (1970), *cert. denied,* 400 U.S. 1009, 91 S.Ct. 569, 27 L.Ed.2d 622 (1971) (holding unconstitutional Arizona's bifurcated trial system) means that Arizona courts did not then routinely exclude psychiatric testimony offered to negate intent. Their supposition is incorrect. *See, e.g., State v. Laffoon,* 125 Ariz. 484, 610 P.2d 1045, 1047 (1980) ("Since the legislature has not seen fit to provide for a defense of diminished responsibility, we have consistently declined to allow psychiatric testimony to negate specific intent.") (citations extending to 1965 omitted); *but cf. State v. Christensen,* 129 Ariz. 32, 628 P.2d 580 (1981)(admitting psychiatric testimony on character trait of defendant, similar to the Wisconsin Supreme Court's decision in *King*).

## VI

We therefore hold that a state is not constitutionally compelled to recognize the

doctrine of diminished capacity and hence a state may exclude expert testimony offered for the purpose of establishing that a criminal defendant lacked the capacity to form a specific intent. Accordingly, we affirm the judgments of the district courts.

CUDAHY, Circuit Judge, dissenting.

Judge Eschbach, for the majority, has performed a remarkable feat of research and analysis in tracing the history of the Supreme Court consideration of the issues before us. Since the Court has said relatively little on these issues, we must give careful consideration to *Fisher v. United States,* 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946), *Coleman v. California,* 317 U.S. 596, 63 S.Ct. 162, 87 L.Ed. 487 (1942), and *Troche v. California,* 280 U.S. 524, 50 S.Ct. 87, 74 L.Ed. 592 (1929). At the same time, our understanding of these cases must be informed by the subsequent Supreme Court decisions in *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), and *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). In both *Washington* and *Chambers,* the Court broke new ground in evaluating state evidentiary rules that exclude evidence offered by criminal defendants. At the very least, these cases hold that a state may not arbitrarily or mechanistically define the uses to which relevant and competent evidence may be put. *Washington v. Texas,* 388 U.S. at 25, 87 S.Ct. at 1926 (Harlan, J., concurring); *Chambers v. Mississippi,* 410 U.S. at 302, 93 S.Ct. at 1049. Given the more recent teachings of *Washington* and *Chambers,* I cannot agree that *Troche, Coleman* and *Fisher* are dispositive of the question presented in the instant case.

## I.

It seems to me that we must face up to assessing the validity of Wisconsin's position—articulated in *Steele v. State,* 97 Wis.2d 72, 294 N.W.2d 2, 13 (1980), and other cases—that psychiatric testimony is relevant and competent to make the "gross evaluation" whether the defendant is sane, that is, of sufficiently sound mind to be criminally responsible; but that such testimony is not relevant or competent for the "fine tuning" necessary to assess capacity

to form an intent of the sort demanded by the criminal law. *See supra* at 24–25. Is this distinction as to use one that we can accept without infringing on a defendant's right to present reliable evidence in his own defense? Or, is it arbitrary and therefore unconstitutional?

I agree that in this highly speculative area, where the potentialities of psychiatry are elusive, we must give careful consideration to the proposition that Wisconsin should, without offending the Constitution, be permitted to draw the distinction it does. Moreover, I believe that our view of the extent to which *Hughes v. Mathews,* 576 F.2d 1250 (7th Cir.), *cert. dismissed sub nom., Israel v. Hughes,* 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978), controls the case before us can and should be guided by the explications of state law contained in *Steele* and in like cases decided since *Hughes. See, e.g., State v. Dalton,* 98 Wis.2d 725, 298 N.W.2d 398 (1980).

For several reasons, however, I do not think the "gross" versus "fine tuning" distinction withstands careful analysis. Therefore, since—as I understand the Supreme Court—the burden is on the state to justify the exclusion for certain uses of evidence it otherwise deems reliable, I am impelled to reach a conclusion which the majority rejects.

First, the state's assertion that it must exclude *expert* testimony on the defendant's *mens rea* lest this testimony interfere with the jury's determination of specific intent to kill seems inconsistent with its willingness to allow the jury to hear all manner of testimony on the very same subject without any expert component. For example, in *Steele:*

Extensive psychiatric and personal history in respect to Steele was introduced without objection by the defense at the guilt phase of the trial. It showed that he had a long history of psychiatric and social problems, that he had been placed in an institution for disturbed children, and that he had been in a boys school and in four foster homes. He spent more than a year in Mendota State Hospital

beginning in 1960. He enlisted in the Navy in 1963; but after five weeks in a regular unit he was placed in a psychiatric unit, and he was subsequently discharged. Upon discharge, he was readmitted to Mendota State Hospital. There was also evidence to show that Steele was a compulsive gambler and that he had gone on at least five gambling binges at Las Vegas. The purpose of all of this evidence was to cast doubt upon the defendant's intent to kill. This evidence, offered for the purpose of rebutting the presumption, was admitted with no objection by the state.

*Steele,* 294 N.W.2d at 5. If this evidence has value for the jury in understanding the defendant's intent—and the *Steele* opinion acknowledged that it has, *see id.* at 6 n. 2, 7 n. 3—it is hard to understand why a psychiatrist's insights would be worthless or exceptionally confusing.

Second, the state's broad exclusionary rule apparently will have the effect of excluding certain psychiatric testimony which would appear to be of exceptional value in clarifying the *mens rea* issues for the jury. For example, in *Commonwealth v. Walzack,* 468 Pa. 210, 360 A.2d 914 (1976), a defendant offered psychiatric testimony to prove that as a result of a lobotomy operation, he lacked the capacity to form the specific intent to kill. It would seem that a psychiatrist could offer unique, and perhaps invaluable, insights to the jury regarding the thought processes of an individual who has undergone a lobotomy. Similarly, in *People v. Wells,* 33 Cal.2d 330, 202 P.2d 53, *cert. denied,* 338 U.S. 836, 70 S.Ct. 43, 94 L.Ed. 510 (1949), a defendant charged with assaulting a prison guard "with malice aforethought" offered psychiatric testimony to explain his abnormally low threshold of fear which caused him to believe he was acting in self-defense. Again, a psychiatrist's testimony on the nature of such a defendant's mental defects would seem to be helpful. *Steele* can be read as excluding such obviously useful psychiatric testimony.

In this connection, the *Steele* court rejected the position that the admission of psychiatric testimony on intent should be left to the discretion of the trial court. This posi-

tion was advocated by Justice Abrahamson, dissenting in *Steele.* It is also a position advocated by Professors Frank Remington and Walter Dickey of the University of Wisconsin Law School in a thought-provoking amicus brief filed in these cases. And it is a position which addresses many of the problems ascribed to Wisconsin's blanket exclusion. *See* Note, *Restricting the Admission of Psychiatric Testimony on a Defendant's Mental State: Wisconsin's* Steele Curtain, 1981 Wis.L.Rev. 733, 767–70 (suggesting guidelines for a case by case approach).

Third, although the state asserted a distinction between expert testimony on *mens rea* capacity and expert testimony with respect to insanity, the Wisconsin Supreme Court also made the point that the former sort of testimony was "substantially congruent with evidence supportive of the . . . test for insanity to be utilized in the second phase of the bifurcated trial. . . . Both tests focus on exactly the same mental defect—lack of capacity." *Steele,* 294 N.W.2d at 9. But this observation seems to suggest that insanity and *mens rea* incapacity are merely labels for the same disorganization of mind and personality; therefore, the evidentiary analysis with respect to one may very well virtually duplicate the analysis of the other.

A comparison of a psychiatrist's testimony on criminal intent and criminal responsibility [sanity] suggests that the concepts to which the psychiatrist is asked to speak in either area are substantively the same. A psychiatrist testifying to mental responsibility is allowed to state his opinion as to whether or not, at the time of committing the crime, the defendant "lacked substantial capacity either to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law." A psychiatrist asked to testify on criminal intent in a first-degree murder trial states his opinion as to whether the defendant, at the time of committing the crime, had mental capacity to form the intent to kill.

In both instances the reliability of a psychiatrist's testimony depends on his

expertise in evaluating the defendant's reasoning capacity in a prior mental state. The *Steele* opinion itself found that the standards for establishing insanity and lack of capacity to intent are "very similar." Psychiatric testimony on similar concepts might be assumed to carry similar expectations of reliability. Note, *supra,* 1981 WIS.L.REV. at 761–62 (footnotes omitted).

Therefore, I find the state's justifications for its position unpersuasive and, on the basis of *Hughes, Chambers* and *Washington,* I would grant the writs.

## II.

Of course, I recognize one very practical consideration which sometimes argues against the admission of psychiatric evidence to prove impaired capacity to form an intent:

Where, as in Wisconsin, the statutes provide that a person found not guilty by reason of insanity is to be committed to a mental treatment facility until recovered and until his return to society presents no danger to the public, the introduction of evidence of mental condition on the question of impaired capacity to form intent during the guilt phase of the trial could well be required to acquit the defendant, sane or insane, without ever inquiring into the issue of sanity and without regard to the provisions of the statute requiring treatment of those pleading and establishing insanity.

*State v. Hebard,* 50 Wis.2d 408, 184 N.W.2d 156, 162 (1971).

In *Hughes v. Mathews,* the state advanced these considerations (or variants of them) as one justification for excluding psychiatric testimony on the issue of specific intent. In *Hughes,* we rejected this justification as unpersuasive since the psychiatric evidence in *Hughes* was offered only to prove that a conviction of second-degree murder rather than of first-degree murder

was proper because specific intent to kill was allegedly lacking. The *Hughes* panel expressly left open the question of admissibility of psychiatric evidence where this kind of evidence could result in an acquittal. Nonetheless, there is an underlying belief that those who commit deadly acts of violence should either be punished by lengthy incarceration in a penal institution or treated for as long a time as may be necessary to be cured in a mental institution. The prospect of psychiatric evidence resulting in the immediate release into society of a presumably dangerous defendant must be one important factor in the state's effort to carefully control the admission of evidence. One can hardly quarrel with the state's concerns in this respect although, in the cases at bar, these concerns are at one remove—as they were in *Hughes*—since the defendants presumably would be convicted of, and incarcerated for, the lesser included offense.

The basic problem in the cases before us is probably *not* that specific intent is more difficult to assess psychiatrically than sanity. The basic problem may be that, under many circumstances, a psychiatrist may not be able to give a reliable opinion as to what the mental condition of the defendant was *at the time the crime was committed. See* W. Winslade & J. Ross, *The Insanity Plea* at 217 (Charles Scribner's Sons, New York 1983). Testimony as to a past state of mind of the defendant may therefore be of dubious reliability whether it relates to insanity or to intent. The distinction which I think deserves study is not between psychiatric evidence on capacity to form an intent and such evidence on insanity but between current clinical assessment and speculation as to a past state of mind.[1] So too a problem exists where judges permit psychiatrists to speak to the ultimate legal issue. *See* Note, *supra,* 1981 WIS.L.REV. at 764–67.

---

1. "Skepticism as to the expertise of psychiatrists to speak to past mental states of criminal defendants, and a concern for the inability of a judge or jury to discern when a psychiatrist has gone beyond his expertise, supports the *Steele* court's decision to return to the total exclusion of all psychiatric evidence on intent. However, these concerns justify the exclusion of *all* psychiatric testimony on a defendant's past mental state, not merely the exclusion of psychiatric testimony on intent." Note, *supra,* 1981 WIS.L. REV. at 760.

Perhaps we can begin with the proposition that what psychiatry knows, or ought to know, best is current clinical observations, with emphasis on assessment of treatability and provision of treatment. *See* Winslade & Ross, *supra* at 225. A psychiatrist ought to be able to size up the general state of a subject's mental malfunctioning, to describe and hopefully classify his affliction and to locate the subject's irrationalities on a scale of severity. A psychiatrist may also have a view of how easily the mental ailment in question will yield to treatment, what sort of treatment is indicated, how long therapy will take and how successful it is likely to be.[2]

What may follow from this estimate of psychiatry's capabilities is the notion that there may be a need for a new approach to the way in which mental illness is acknowledged and responded to by our criminal justice system. The authors of *The Insanity Plea, supra,* suggest, for example, that issues of mental illness should be reserved for a "disposition" phase of a criminal adjudication. Further, the authors recommend that mental illness be viewed as a "more or less" rather than an "all or nothing" proposition. The object of the disposition phase would be to apportion the defendant's sentence between treatment for his mental illness and incarceration as punishment for his crime: "the less sane would receive more treatment, while the more sane someone is, the more punishment he would receive." Winslade & Ross, *supra* at 220. Obviously, there could be many questions—some fundamental—about such a procedure, but the time may be upon us to ask questions boldly.

I recognize that I have strayed from the issues presented by this record. But the issues directly presented here, as well as those suggested by the analysis, are of immense seriousness and difficulty and have wide ramifications for the administration of justice. Given the strong teaching of *Hughes,* given the record before us (which

does not raise what I think may be some fundamental problems associated with the insanity defense—or its variants), and given the other factors to which I have briefly adverted, I cannot join the majority—much as I empathize with its efforts to dispose fairly of an extraordinarily perplexing problem.

Hence, I must respectfully dissent.

---

**2.** It is opinions and assessments related to these issues, perhaps, which Justice (now Chief Justice) Heffernan had in mind when in *Steele* he spoke of a psychiatrist's "gross evaluation that a person's conduct and mental state is so beyond the limits of accepted norms that to hold him criminally responsible would be un-

just." *Steele,* 294 N.W.2d at 13. Such a "gross evaluation" in terms of sanity and insanity is in the view of the Wisconsin Supreme Court the sort of task that expert testimony can legitimately undertake.

