STATE of Wisconsin, Plaintiff-Respondent,

v.

Lawrence N. DALTON, Defendant-Appellant.†

Court of Appeals

*No. 80–270–CR.  Argued August 21, 1980.—*
*Decided September 16, 1980.*
(Also reported in 298 N.W.2d 398.)

† Petition to review denied.

726

For the defendant-appellant there was a brief and oral argument by *Mark Lukoff*, first assistant state public defender.

For the plaintiff-respondent there was a brief by *Bronson C. La Follette*, attorney general, and *Sally L. Wellman*, assistant attorney general, and oral argument by *Sally L. Wellman*.

Before Decker, C.J., Voss, P.J., and Brown, J.

DECKER, C.J. Lawrence Dalton lured Blanche Penna to Dalton's residence where he handcuffed and gagged her, had forcible sexual intercourse with her and then killed her. Dalton was convicted of first-degree murder, kidnapping by deceit, and first-degree sexual assault. He appeals. We affirm.

## FIRST-DEGREE MURDER

Dalton contends that he was erroneously convicted of first-degree murder because he did not have the intent to kill his victim. Dalton attributes the allegedly erroneous conviction to the trial court's exclusion of psychiatric testimony that Dalton did not have the specific intent to kill at the time of the homicide. We believe that the exclusion of such evidence in this single-phase trial was validated by our supreme court in *Steele v. State*, 97 Wis.2d 72, 294 N.W.2d 2 (1980) when it said: "The exclusion [of psychiatric specific intent evidence] is proper in either a single phase trial or the guilt phase of a bifurcated trial." 97 Wis.2d at 97, 294 N.W.2d at 14.

On oral argument on appeal, Dalton's counsel conceded the applicability of *Steele* and urged us to conclude the issue with its application. Nonetheless, we are aware that

(1) there is a motion for reconsideration pending in *Steele;*

(2) there is the potential for adjudication of the same issue in the federal court system; and

(3) the application of *stare decisis* is open to question because *Steele* is a two-phase trial case, and the quoted statement, although an unmistakable direction to Wisconsin courts, is technically dictum in its application to a single-phase trial.

For these reasons, we think it necessary to address the preliminary question of conditional relevance which we believe controls this case irrespective of the application of *Steele*.

In an offer of proof by question and answer made out of the presence of the jury, a psychiatrist whose qualifications in that respect were not challenged, testified upon behalf of Dalton, that he

(1) was not suffering from a mental disease or defect;

(2) was a sociopathic personality; and

(3) did not intend to kill his victim.

Upon further examination, the witness stated that Dalton had the capacity and mental purpose to engage in "meaningful" actions which would result in taking another's life.

A different psychiatrist also testified that Dalton was a sociopathic personality and explained the significance of the sociopathic personality diagnosis that was arrived at by both psychiatrists:

It means that a person has a certain kind of behavior through his life which is not a mental illness which does not interfere with his understanding of right or wrong which does not interfere with the capacity to understanding [sic] the wrongfulness or rightfulness of the action.

The second psychiatrist was withdrawn as defense witness when he stated that Dalton did have the capacity to form the specific intent to kill. He also stated that he was not aware of anything in the field of psychiatry which substantiated the theory that a psychiatrist could express an opinion on whether or not a person had the intent to kill at the time he committed the homicide.

The first psychiatrist, after expressing the opinion that Dalton did not have the intent to kill his victim, also said "I don't know if he made [sic] that intent or not." The psychiatrist also said:

I don't think his personality, per se, would negate his having an intent. I feel that his behavior up until that point was not one where he would get some kind of sexual thrill or sexual excitement out of killing the person that he was being sexually involved with. There was some sexual excitement or thrill or some satisfaction if the person was bound up or handcuffed or in some way

was resisting him. But the history I had that there was no incident where he told me of having gone beyond some kind of minor physical violence with the woman that would result in her death. So his personality, itself, I don't think was against that. It's just that his behavior was not consistent with his going on with a violent type of action.

Then he justified his ability to render an opinion as to Dalton's intent in this fashion:

Based upon the fact that I have been a psychiatrist since 1962. I have dealt with people with all different kinds of psychological problems from all different types of social and economic environmental backgrounds. I have examined probably in excess of fifty people who have committed murder and talked to them extensively about the crime and about their intentions with the crime. And I feel that I have had more experience in the psychology, the understanding of what makes people do things, their motivations and what is going on in their behavior than the average lay person would have.

The context of the statement and its contend leads us to view it as self-qualification of the psychiatrist as a "super juror."

The trial court concluded that the first psychiatrist's testimony was inadmissible because it was "not competent;" that is, not evident that he was applying his psychiatric expertise in arriving at the opinion that Dalton did not have the specific intent to kill.

A preliminary question concerning the qualification of a person to be a witness and the admissibility of the proposed evidence from the witness is determined by the trial judge pursuant to secs. 901.04(1), (2) and (3), Stats., and that was done in this case.

We agree with the trial court's determination that the offered testimony from the psychiatric witness was not "scientific technical or other specialized knowledge"

which would "assist the trier of fact to understand the evidence or to determine a fact in issue" and thus was properly excludable pursuant to sec 907.02, Stats. The psychiatrist's qualifications as an expert were conceded; however, that does not end the inquiry with respect to whether an expert should be permitted to give evidence to the fact trier, sec. 907.02, and whether to permit the exercise of an expert's prerogative to address the fact trier in the form of opinion or inference. Sec. 907.04.

The record in this case establishes that the psychiatric witness had no scientific knowledge which formed the basis for his opinion as to Dalton's lack of specific intent to kill, but rather arrogated to himself an ability superior to that of the jury to evaluate evidence and arrive at a determination of whether Dalton had the intent to kill his victim. That kind of evidence is without the redeeming qualities of scientific knowledge or assistance to the jury required by sec. 907.02, Stats. It constitutes no more than lay opinion of an ultimate fact to be determined by the jury. Its vice is that it is clothed with the seeming scientific knowledge of an expert and thus deceives the jury into believing that it is entitled to deference and consideration which is unsupported and unwarranted.

If the rule permitting the limited introduction of lay opinion evidence were so loosely administered, every trial could culminate in decision advice to the jury or judge from journalists, attorneys, insurance adjusters, and a host of others in occupations with experience in evaluating the experiences that people relate. Such views, as well as the proffered testimony of the psychiatrist in this case, patently fail admission as lay opinion, pursuant to sec. 907.01, Stats., because they are not based upon the rational perception of a witness, nor helpful to a determination of a fact in issue.

We conclude the record establishes that the proposed testimony from the psychiatric witness was not admissible as expert or lay opinion, and that the record does not contain evidence sufficient to support a finding pursuant to sec. 901.04(1) and (2), Stats., that such testimony was qualified for admission pursuant to secs. 907.-01 or 907.02. The trial court did not abuse its discretion in excluding the proffered testimony. We emphasize that we arrive at this conclusion without applying the exclusionary rule enunciated in *Steele*.

Dalton also complains that his wife Karen should not have been permitted to testify that Dalton admitted to her that he had killed Blanche Penna and buried her body near the residence he occupied with Barbara Filipski. He made the statement to Karen in the presence of Dalton's four children (by Karen, Barbara, and Kathy Penna), whose ages ranged from three or five and one-half years. Dalton contends that the statement was inadmissible because it was a privileged, private communication to his wife. Sec. 905.05(1), Stats. We need not determine whether such a statement in the presence of small children was a private communication[1] (as did the trial court), because we agree with the trial court's conclusion that the privilege, if it existed, was waived by subsequent disclosures of the significant part of the private communication. Sec. 905.11.

After the disclosure to his wife Karen, Dalton admitted to two Cleveland, Ohio and one Waukegan, Illinois

[1] At the time that Dalton killed Blanche Penna, he admitted to Barbara Filipski that he thought he had killed Blanche. Immediately thereafter he disposed of her body. The admission to Barbara, of itself, may have destroyed the "private" nature of the subsequent communication to his wife. That point has not been argued in this case.

policemen that he choked and killed Blanche Penna. He also made substantially the same admission to a county jail inmate. When Dalton took the witness stand, he did not deny choking and killing Blanche Penna. The thrust of his testimony was in support of his contention, then and now, that the crime was second-degree murder because he did not intend to kill her.

Although the statement to Karen seems to provide a stronger inference of intent to kill, the other admissions support the same inference. In any event, the inference to be drawn from the statement to Karen is irrelevant to the question of waiver. We agree with the trial court's finding that the privilege was unmistakably waived.

Dalton further complains that other-crimes evidence was successfully introduced against him through prosecutorial misconduct in avoiding a trial court exclusion order.

During the investigation of Dalton's murder of Blanche Penna, Dalton was accused of having killed a different young woman in Chicago, Illinois. Pursuant to secs. 904.03 and 904.04(2), Stats., Dalton successfully sought an order of the trial court excluding reference to the reputed Chicago killing.

Early in the trial, Barbara Filipski, the woman with whom Dalton lived (sometimes alone and sometimes along with his wife and another "girlfriend" of his), testified that a fourteen-year old girl had accused Barbara of killing a girl in Chicago. Dalton concedes that this reference did not unfairly prejudice his defense. He contends, however, that the reference aggravated a circumstance occurring later in the trial when a police officer witness read to the jury a response made by Dalton during custodial interrogation:

Q. Your questioning: "Are you willing to go to court tomorrow and sign the papers to return to Illinois?"

A. "Yes, I will sign them. I just want to get it over with. *I killed them people* and I want to get it over with. I don't want to go to jail. I need help. I can't remember. I just don't know." [Emphasis supplied.]

The prosecutor solicited the response in direct violation of the trial court's order, although the prosecutor assured the trial court that it was inadvertent and the trial court so concluded.

The receipt of the evidence was patent error and the trial court thought it so unfairly prejudicial as to require him to avoid highlighting or explaining the reference by a corrective jury instruction. We note, however, that the trial court analyzes an occurring error in the perspective of the prospect of unfair prejudice to the defendant; however, we view such error in the perspective of whether the prospect of unfair prejudice was realized. Sec. 901.03 (1), Stats. We conclude that it was not.

■ Dalton confessed the killing to three police officers and a county jail inmate. Although the confessions are not necessarily direct evidence of the element of intent to kill, they are circumstantial evidence from which the intent to kill may be inferred. Dalton contends the police officer's testimony that Dalton said "I killed them people" is unfairly prejudicial because it is corroborative of his intent to kill Blanche Penna. Although intent to kill may be inferred from the quoted statement, it is circumstantial evidence, not direct evidence, of intent to kill, and stands on no different footing than the other confessions. In view of the overwhelming evidence from which Dalton's intent to kill Blanche Penna may be inferred, we find the error harmless.

## KIDNAPPING BY DECEIT

· We have avoided chronicling the vulgar, sordid, and obscene relationships between Dalton, his wife, and two "girlfriends," and their heterosexual and homosexual involvements. It is sufficient to note that the three women worked variously as prostitutes, nude and semi-nude gogo dancers, and masseuses in a massage parlor. Dalton supervised their earnings and threatened and dominated them in sexual activity for pleasure and pay. When a fourteen-year old girl joined the group, he had sexual intercourse with her, demanded that she engage in sexual activity with the women, and took photographs of the acts in order to dominate her and prevent her from leaving.

A substantial portion of the trial was devoted to detailing the sordid relationships. It was received without objection from Dalton because it was the theory of his defense that he was attempting to make Blanche Penna one of his women, and thus, it was not his intention to kill her.

On the day Blanche Penna was killed, Karen Dalton was living at one location in Kenosha, and Barbara Filipski was living at another. Kathy Penna's location is uncertain, although later she left the group for some unknown location. Dalton had "custody" or control of his child by her. That child and his children by Karen and Barbara were with them. It is not clear where the children customarily resided, but it is clear that they visited at both homes. Dalton lived with Barbara, but he sometimes stayed at Karen's residence.

Karen and Dalton arrived in the morning at the Penna home in Racine in separate automobiles. Karen had told Dalton to take Blanche to the unemployment compensation office in Racine, and Karen was to take Mrs. Penna and another Penna daughter somewhere else.

Dalton admitted that he had at times thought of having sexual intercourse with Blanche. He had touched her breast and made oblique remarks to prompt a discussion of intercourse, but had made no overt attempts. He also had discussed with Barbara the subject of his desire for sexual intercourse with Blanche.

Although Dalton never took Blanche to the unemployment compensation office, he falsely stated that he did when her disappearance was being investigated after the killing. Dalton testified that he took Blanche to a house of his where he waited for an exterminator. After talking to the landlord, they left and he took her to the residence he shared with Barbara. A trailer adjacent to the residence could be entered from the residence. Dalton had attempted to soundproof the trailer by installing particle board. Dalton had tested the soundproofing by having Barbara enter the trailer and scream as loudly as she could while he listened from outside. He told Barbara that he intended to keep a girl locked in the trailer bathroom.

Upon arrival at the residence, Dalton told Blanche to wait outside. He entered and asked Barbara whether she wanted to have a party with Blanche, but Barbara declined. Dalton frequently had two of the women engage in simultaneous cunnilingus after which he would have sexual intercourse with one of them.

After Barbara declined, Dalton announced that he would have a party with Blanche. Barbara was in the living room with the children. Dalton called Blanche into the home by a side door which lead directly into a bedroom. Dalton put handcuffs on her, stuffed a sock in her mouth, and wrapped duct tape around her head and over her mouth. When he testified at trial, he stated that securing her was a joke on the children to which Blanche agreed and that the duct tape was wrapped loosely about her head. A pathologist who examined her

body stated that strictures in the tissues of her body demonstrated that the tape was drawn tight.

Dalton next removed her slacks and had sexual intercourse with Blanche. He returned to the living room, told Barbara that he had sexual intercourse with Blanche, and stated that now he couldn't let her go because she would tell what he had done. Barbara entered the bedroom, saw Blanche handcuffed and gagged, saw recognition in her eyes, and concluded she was alive. Barbara returned to the living room and Dalton reentered the bedroom.

Barbara heard thumping against the wall and took the children out into the yard. Dalton came outside and told Barbara he thought Blanche was dead, and that he thought he had killed her. He returned to the bedroom, wrapped Blanche's body in a sheet, removed the body, and placed it in the trunk of his car. After Barbara departed to her nearby evening employment as a dancer, Dalton buried Blanche's body in the yard.

The essential elements of kidnapping by deceit are defined in sec. 940.31 (1) (c), Stats.,[2] as follows:

(1) exercise of deceit;

(2) another person is induced by this deceit to go from one place to another; and

---

[2] Sec. 940.31 (1) (c), Stats., states:

*Kidnapping.* (1) Whoever does any of the following is guilty of a Class B felony:

(a) By force or threat of imminent force carries another from one place to another without his consent and with intent to cause him to be secretly confined or imprisoned or to be carried out of this state or to be held to service against his will; or

(b) By force or threat of imminent force seizes or confines another without his consent and with intent to cause him to be secretly confined or imprisoned or to be carried out of this state or to be held to service against his will; or

(c) By deceit induces another to go from one place to another with intent to cause him to be secretly confined or imprisoned or to be carried out of this state or to be held to service against his will.

   (3)  an intent to cause that person to be

   (a)  secretly confined or imprisoned;

   (b)  carried out of the state; or

   (c)  held to service against his or her will.

Dalton does not challenge the evidence of any of the elements of the kidnapping charge except deceit, and indeed cannot in view of the thrust of his defense—that his actions were designed to bring Blanche Penna into the family of women that he had assembled for the purposes of prostitution and his own sexual gratification. He claims, however, that the evidence was not sufficient to establish the element of deceit beyond a reasonable doubt and for that reason he was unconstitutionally convicted, and contends that

   (1)  there were "no words or conduct on defendant's part that would tend to destroy or take away the exercise of free will or choice" of the victim;

   (2)  there is no circumstantial or direct evidence of deceit; and

   (3)  the described circumstances "provided merely the occasion for the acts that took place."

In sec. 940.31 (1) (c), Stats., unlike in subsections (a) and (b), lack of consent on behalf of the victim is not an element of the crime. Deceit, as used in sec. 940.31 (1) (c), necessarily implies that the victim be unaware that he or she is being kidnapped. *See State v. Colbert,* 221 Kan. 203, 557 P.2d 1235, 1241 (1976). Occasion for exercise of free will or choice will not ordinarily arise, and the induced travel from one place to another will usually appear consensual, if the deceit is successful.

Dalton relies on *State v. Holt,* 223 Kan. 34, 574 P.2d 152 (1977), in which a conviction for kidnapping by deception under sec. 21–240, Kan. Stats., was reversed. That court held that no deception was shown because no evidence was introduced that the defendant made any statements or representations to the victim. Dalton

urges that he cannot be convicted under sec. 940.31(1)
(c), Wis. Stats., absent proof of express or implied
representations.

Dalton's reliance on *Holt* is misplaced. The Kansas
court applied the definition of deception in sec. 21–3110
(5), Kan. Stats.: "knowingly and willfully making a false
statement or representation, express or implied, pertain-
ing to a present or existing fact." The pertinent Wis-
consin kidnapping by deceit statute is not circumscribed
by a statutory definition.

Our task is to determine the intent of the legislature,
*Milwaukee County v. ILHR Dept.*, 80 Wis.2d 445, 451, 259
N.W.2d 118, 121 (1977), primarily from the statute it-
self, *Druml Co., Inc. v. New Berlin*, 78 Wis.2d 305, 309,
254 N.W.2d 265, 266 (1977), by resort to the common
and approved usage of the words and phrases used. Sec.
990.01(1), Stats. Such usage can be established by a
recognized dictionary and resort to case-law definitions.

Webster's Third New International Dictionary defines
"deceit" broadly:

[T]he act or practice of deceiving (as by falsification,
concealment, or cheating) . . . any trick, collusion, con-
trivance, false representation, or underhand practice
used to defraud another . . . . DECEIT implies the in-
tent to mislead and can cover misrepresentation, falsifi-
cation, fraud, or trickery of any kind . . . .

The constituent elements of deceit: trick, contrivance,
concealment, falsity, or delusion, have been incorporated
in case-law definitions:

"Deceit" is any trick, collusion, contrivance, false rep-
resentation, or underhand practice, used to defraud an-
other. *Dickey v. Brannon*, 118 Ga. App. 33, 162 S.E.2d
827, 829 (Ct. App. 1968).
"Deceit" is either the suggestion as a fact, or that
which is not true, by one who does not believe it to be

true, or the suppression of a fact, by one who is bound to disclose it, or who gives information or other facts which are likely to mislead for want of communication of that fact. *M. G. Chamberlain & Co. v. Simpson,* 173 Cal. App.2d 263, 343 P.2d 438, 445 (Ct. App. 1959).

The thrust of Dalton's argument strikes at the very purpose of the legislature in prescribing deceit as an alternative to the threat or use of force to accomplish kidnapping. We believe that the use of the term deceit without a circumscribing definition evidences the intent of the legislature to avoid limiting the proof to misrepresentations, express or implied. Limiting proof of deceit to express or implied misrepresentations would offer no protection to the victim who was artfully deceived by a person who lured and trapped his victim without resort to misrepresentation.

The uncontroverted evidence is that Dalton represented that he would transport his victim from the Penna home to the unemployment compensation office. He never did so. The mere fact that he informed the victim of the other destinations without evidence of protest from her demonstrates his guile, but not an abandonment of the planned destination. We conclude that the deception began with the diversion from the unemployment compensation office as the direct destination.

We would also note that by his own testimony, the deceitful asportation and imprisonment of his victim unqualifiedly occurred when he called her into the bedroom, manacled and gagged her under the guise of playing a joke on the children, and then proceeded to forcibly remove her clothing and compel sexual intercourse.

The evidence overwhelmingly established that Dalton first "stalked" Blanche Penna for the purpose of having sexual intercourse with her and then lured her into a bedroom in his residence to accomplish his purpose. Then he manacled and gagged her and fulfilled his goal

by forcibly having sexual intercourse with her. We view these circumstances as sufficient evidence to establish the requisite deceit and not as merely setting the stage for Dalton's subsequent intercourse.

■

We believe that the described conduct constituted kidnapping by deceit, pursuant to sec. 940.31(1)(c), Stats., irrespective of whether Dalton's conduct is construed to be express or implied misrepresentations. The legislature's intent in the use of the unlimited term "deceit" was to proscribe wily and cunning stratagems that are contrived to delude the victim and conceal the violator's intent to effectuate the crime defined in sec. 940.31(1)(c). The crime is proscribed by the statute, whether the deceit constitutes affirmative acts to delude, or omissions that conceal the intent and purpose of the charged defendant. Dalton's conduct, no matter how it is viewed, constitutes a violation of the statute.

## FIRST-DEGREE SEXUAL ASSAULT

■

Dalton appeals from the circuit court order of commitment after his conviction for first-degree sexual assault. Dalton admitted in his testimony that he had nonconsensual intercourse with his victim. None of the issues raised by Dalton on this appeal apply to the sexual assault conviction. He claims that the trial court should have granted his motion for a mistrial because the other-crimes evidence prejudiced the first-degree murder charge. He reasons that the mistrial would have terminated the trial of the sexual assault charge. We reject his contention because we find no unfair prejudice to his first-degree sexual assault case to which he admitted when he testified.

*By the Court.*—Judgment and order affirmed.