STATE of Wisconsin, Plaintiff-Respondent,

v.

Craig A. SWOPE, Defendant-Appellant.†

Court of Appeals

*No. 2007AP1785–CR. Submitted on briefs August 13, 2008.
—Decided November 19, 2008.*

**2008 WI App 175**

(Also reported in 762 N.W.2d 725.)

† Petition to review denied 3/17/09.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Dianne M. Erickson* of *Wasielewski and Erickson*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *William L. Ganser*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Brown, C.J., Anderson, P.J., and Snyder, J.

¶ 1. ANDERSON, P.J. Craig A. Swope appeals from his conviction for two counts of intentional first-degree homicide. He claims that the trial court erred in permitting an FBI agent to testify about a "death scene" analysis that he conducted. First, Swope asserts that "death scene" analysis is a "junk science," and the agent was not qualified to give an expert opinion. Second, he argues that the admission of the agent's conversations with third parties violated his confrontation rights. We reject his claims and affirm. The admission of the agent's expert testimony met the standards of the relevancy test that Wisconsin uses for assessing expert testimony. And, Swope's confrontation rights were not impinged upon by the agent testifying about information and opinions he got from third parties.

*FACTS*

¶ 2.    Duane and Carolee Recob had not been seen by their grandchildren since the last weekend of 2003. Becoming concerned about the grandparents, the grandchildren went to the Recob home on February 29, 2004, and asked town of Delavan police officers to come to the home and conduct a welfare check. Upon entering the home, the officers found both Recobs dead, their bodies decomposed and mummified. Duane was found in a recliner in the living room and Carolee was found lying on her side in bed, covered by a blanket.

¶ 3.    After extensive investigation, the Recobs' son, Craig Swope, was charged with two counts of first-degree intentional homicide in violation of Wis. Stat. § 940.01(1)(a) (2001–02).[1] At the preliminary examination, the medical examiner testified that the condition of the bodies made it impossible to determine a specific cause for the simultaneous death of the Recobs. The medical examiner's opinion was that the deaths were homicides caused by some form of asphyxial type injury "or some other type of injury not detected at the time of the autopsy." Defense counsel asked if there was another

---

[1] Pursuant to a plea agreement in Walworth county case No. 2004CF221, Swope pled guilty to the twenty counts of forgery for writing checks on the Recobs' checking account and other charges against him were dismissed and read in. He was sentenced to twenty years of initial confinement and twenty-one years of extended supervision on the first seven counts of forgery. The court withheld sentence and placed Swope on probation for ten years on the remaining counts. Swope appealed, and we rejected his challenge to his sentences. *State v. Craig A. Swope,* No. 2006AP408–CR, unpublished slip op. ¶ 2 (WI App Sept. 12, 2007).

All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

cause of death. The medical examiner replied that it was possible for the Recobs to have had simultaneous cardiac arrhythmia. However, he believed the chance of such an event to be so extremely rare that it was not a consideration.

¶ 4. In the course of the investigation, the authorities contacted Supervisory Special Agent Mark Safarik of the Federal Bureau of Investigation, Behavioral Analysis Unit (BAU) in Quantico, Virginia, to conduct a "death scene" analysis in an attempt to determine the cause of death. Safarik prepared a Criminal Investigative Analysis—Equivocal Death report which was filed with the court. Defense counsel filed a motion in limine to exclude the testimony of Safarik. In the motion, defense counsel asserted the proposed testimony was not relevant and it was inadmissible as expert testimony because "there is no scientific knowledge that formed the basis of [Safarik's] opinion." The trial court denied the motion, finding that the testimony would assist the jury on the question of whether the Recobs' death was by natural causes or homicide. Further, the court held that Safarik could give testimony based on the opinions of third parties. Finally, the court said Swope's complaint, that there were no statistics to support the agent's opinion, was for cross-examination.

¶ 5. Swope renewed his motion on the fourth day of trial. Specifically, he moved to exclude any testimony from Safarik about his conversations with third parties regarding the probability of simultaneous death because Swope would not have the chance to cross-examine the third parties. Swope's counsel contended that he did not have access to the data the third parties relied upon. While acknowledging that an expert can rely upon information from others,[2] he argued that the rule is only

---

[2] WISCONSIN STAT. § 907.03 provides:

applicable to what is common knowledge within a specialty and does not apply when the information is in private databases, inaccessible to the public. The court denied the motion, ruling that Swope can expose the basis of Safarik's opinion during cross-examination.

¶ 6.   Safarik testified that he had a bachelor's degree in human physiology, a master's degree in criminal justice, has been an agent for twenty-two years, and for eleven and one-half years has been assigned to the BAU within the FBI's critical incident response group; specifically, the unit that investigates homicides. He told the jury that he had analyzed more than 1000 crime scenes, including at least thirty crime scenes where there was an equivocal death—an undetermined cause of death. Some of the cases he has worked on were referred by international law enforcement agencies. During the course of his career, he has published articles in peer-reviewed journals and international criminology journals. As a member of the BAU, he has lectured on a variety of subjects to over 15,000 professionals.

¶ 7.   Safarik said that one of his current duties is "the critical review of violent crime scenes" from both the "behavioral and forensic perspective, integrating the two." He explained:

> Well, the crime scene analysis that we do really is a multi disciplinary approach to looking at violent crime, that, you know, violent crimes can be very complex. They can be simple. They can be very complex. Typically the types of cases that we are sent in our unit because we're a very small unit and specialized tend to

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

be very violent types of cases, very unusual, very bizarre, high profile cases, and what we do is we look at the behavior at the crime scene, so ultimately almost everything you do involves a crime scene analysis, and it is a multi disciplinary approach, and I mean by that is I'm considering the forensic pathology, wound pathology, forensic blood stain analysis, any reports prepared by other experts, toxicology reports.

The autopsy report is prepared by a medical expert, and then I integrate that with what I see in terms of the behavior, the crime scene so that the totality of the circumstances that are occurring at the crime scene are integrated together, so I'm looking at all of the attributes or all of the components of what is happening with the crime scene.[3]

[3] Safarik was asked to compare his work for the FBI with television shows such as *Quincy, M.E.* (NBC series, 1976–83) (A television crime drama series about Dr. Quincy, a strong-willed medical examiner in Los Angeles county working to ascertain facts about suspicious deaths. In the process, he frequently comes into conflict with his boss and the police, each of whom have their own (often flawed) ideas about what is going on.). Wikipedia.org, Quincy, M.E., http://en.wikipedia.org/wiki/ Quincy, M.E. (last visited Sept. 30, 2008); and *CSI: Crime Scene Investigation* (CBS series, 2000–08) (A television crime drama series that trails the investigations of a team of Las Vegas forensic scientists as they unveil the circumstances behind mysterious and unusual deaths and other crimes.). Wikipedia. org, CSI: Crime Scene Investigation, http://en.wikipedia.org/ wiki/CSI:_Crime_Scene_Investigation (last visited Sept. 30, 2008). Safarik responded:

Yes, it's television and it's—it is a problem for law enforcement I think because there is an expectation by people who watch those shows, things like Criminal Mind. The FBI profile does not have a Gulf Stream that we fly around in. Contrary to popular opinion we still fly coach.

What they do in television just many times is simply not feasible in the real world and it—it really takes at least from my perspective

¶ 8. Safarik said that he conducted a death analysis, not a crime scene analysis, at the request of the investigating officers and prepared a written report. He did not visit the Recobs' home, but reviewed photographs of the death scene and extensive investigative materials including the autopsy and toxicology protocols for both Recobs. In order to offer an opinion about the manner and cause of death he considered: the location of the death scene; the crime demographics of the geographic area; the ability to access the scene and the victims; the level of risk of violent crime to which the victims were exposed; the degree of control exercised over the victims and their movement within the scene; victimology information on Duane and Carolee; the absence of any identifiable injury and the relationship to manner of death; the sites within the scene where both victims were located and their positions; and the presence or absence of other activity at the scene.

¶ 9. Safarik gave detailed testimony about all nine factors. He also related discussions he had with two sources outside of the FBI. First, he discussed simultaneous natural death with Nicholas Christakis, M.D., Ph.D., of Harvard. Dr. Christakis had studied 1,040,000 elderly couples who had died over a period of nine years. Safarik said Dr. Christakis was of the

and looking and working with other law enforcement and medical professionals a critical detailed review of these types of crimes or these types of death scenes to figure out what is going on, and its very tedious, and it is not very glamorous, but that really would not work in a television show, so I think although it is entertaining, it is simply not reality.

For a discussion of what the main stream media has dubbed the "CSI effect" see Tom R. Tyler, *Viewing CSI and the Threshold of Guilt: Managing Truth and Justice in Reality and Fiction,* 115 YALE L.J. 1050 (2006).

opinion that "having two people die of natural death within a couple hours is such a statistically small number as to be almost impossible."

¶ 10.   Safarik also consulted with Richard Anderson, Chief of Mortality Statistics for the Center for Disease Control. Anderson shared the same opinion as Dr. Christakis. The "likelihood of both of these people dying of natural causes is really so remotely small as to be almost impossible."

¶ 11.   After laying this foundation, the State asked the critical question:

> STATE:   So your conclusion then based on looking at all of these factors, looking at possibilities of equivocal death, what is your conclusion to a reasonable degree of scientific certainty regarding the deaths of Carolee and Duane Recob?
>
> DEFENSE ATTORNEY:   I'm going to object to that. Is he asking of this man's opinion? What this man has done is he expressed opinions of two people he talked to. He has testified he is not a statistician. Is he asking for a reasonable degree of scientific certainty? He is not qualified to give that opinion. I think he has given his opinion that this is a remote possibility and that is about as good as he gets.
>
> THE COURT:   I think he is talking about the five categories of death, right?
>
> STATE:   Correct.
>
> THE COURT:   And do you have such an opinion as to that in this case?
>
> SAFARIK:   I do. But I would not say it is . . . scientific.
>
> STATE:   Reasonable degree of certainty in your profession?

SAFARIK: Of my expertise and having looked at the scene, it is my opinion considering everything together that the deaths of Carolee and Duane are most consistent and supported by this being a smothering, an asphyxiant or smothering homicide.

¶ 12. The medical examiner testified after Safarik and stated that he could not identify a specific cause of death. He told the jury that he considered both deaths to be homicides. He offered his "opinion within a reasonable [degree of] medical certainty that they died from asphyxia caused by another person." On cross-examination, he rejected the theory that the Recobs died from simultaneous cardiac arrhythmia, "[i]t would be extremely rare to have two people die at the same time."

¶ 13. Swope was convicted of both counts of intentional first-degree homicide. The trial court sentenced Swope to concurrent life sentences, concurrent to sentences already being served. Further, the court found that he was ineligible for release to extended supervision. Swope appeals.

¶ 14. On appeal, he renews both objections to Safarik's testimony. First, he asserts that Safarik assumed the jury's role by evaluating the evidence and, thus, his testimony was improperly admitted. Second, he contends that the court erred in permitting Safarik to convey the hearsay opinions of the two experts he consulted.

### ADMISSION OF EXPERT OPINION

¶ 15. We first consider Swope's challenge to the admission of the agent's expert testimony. WISCONSIN STAT. § 907.02 allows expert testimony to be admissible if it helps the trier of fact to understand the evidence or to determine a fact in issue:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

■■

¶ 16. Determining whether expert testimony assists the fact finder is a discretionary decision of the circuit court. *See State v. Pittman*, 174 Wis. 2d 255, 268, 496 N.W.2d 74 (1993). We will uphold a circuit court's discretionary decision "if the circuit court logically interpreted the facts, applied the proper legal standard, and used a demonstrated rational process to reach a conclusion that a reasonable judge could reach." *State v. Keith*, 216 Wis. 2d 61, 69, 573 N.W.2d 888 (Ct. App. 1997).

¶ 17. Swope challenges Safarik's testimony contending that it is supported by "little, if any, science"—he calls it "junk science." Swope argues that because Safarik's analysis and opinion were based on the same evidence presented to the jury, that his testimony was not expert testimony; that he was nothing more than a "super juror," usurping the role of the jury.

■■

¶ 18. Wisconsin employs the "relevancy test" to resolve the admission of challenged scientific, technical or other specialized evidence. *State v. Peters*, 192 Wis. 2d 674, 687–88, 534 N.W.2d 867 (Ct. App. 1995). The test is straightforward and simple, expert testimony is admissible if (1) it is relevant, (2) the witness is qualified based on his or her "specialized knowledge," and (3) the testimony will help the trier of fact in determining an issue of fact. *Id*. The relevancy test does not require the reliability of the underlying scientific evidence be established. *Id*. at 688. Wisconsin's approach is unique because the

vast majority of jurisdictions employ some form of the federal reliability test embodied either in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), or the combination of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

¶ 19. One scholarly observer of the Wisconsin evidence scene has remarked:

> The relevancy test offers a substantively distinct alternative to the federal reliability rule that is built upon a vastly different set of assumptions, namely, a commitment to and confidence in the modern adversary trial. In contrast, the federal approach evinces a distinct distrust of the adversary trial and lay fact finding, despite protests to the contrary, and is more attuned to summary judgment adjudication than trial. Under the relevancy test, the strengths and weaknesses of an expert's testimony are, one assumes, sufficiently exposed through cross-examination and impeachment before a trier of fact capable of sorting through the issues; it is unnecessary for trial judges to first screen the testimony for reliability, especially as judges may be no better equipped for the task than the lay jury. Thus, the relevancy test strives to assure fair adversary trials, not arbitrate scientific disputes. This said, federal developments have, however, affected Wisconsin's relevancy approach, transforming it in subtle, important ways that nonetheless reaffirm its faith in adjudication by trial.

Daniel D. Blinka, *Expert Testimony and the Relevancy Rule in the Age of Daubert,* 90 MARQ. L. REV. 173, 175–76 (2006).

¶ 20. Relevancy. WISCONSIN STAT. § 904.01 defines "relevancy":

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of

133

consequence to the determination of the action more probable or less probable than it would be without the evidence.

There are two features of relevancy. First, the evidence must relate "to a fact or proposition that is of consequence to the determination of the action." *State v. Sullivan*, 216 Wis. 2d 768, 785, 576 N.W.2d 30 (1998). Second, the evidence must have "a tendency to make a consequential fact more probable or less probable than it would be without the evidence." *Id*. at 786.

¶ 21.   A central issue in this case was the cause of the Recobs' deaths. Specifically, whether the simultaneous deaths of the Recobs were the result of natural causes, an accident, or of a crime. Safarik's proffered testimony was directly on point; the investigating authorities sought out his expertise in analyzing death scenes or crime scenes. Because of the decomposition of the bodies, his help in determining a cause of death was critical to the success of the investigation. His conclusion, that the deaths were homicides and that it was improbable that they were brought about by simultaneous natural causes, establishes a consequential fact.

¶ 22.   Swope appears to argue that the death scene analysis is not relevant because it has very little science behind it; he goes so far as to label it "junk science." However, "scientific evidence is admissible under the relevancy test regardless of the scientific principle that underlies the evidence." *Peters*, 192 Wis. 2d at 688.

¶ 23.   <u>Qualifications</u>. WISCONSIN STAT. § 907.02 requires the proffered expert witness be qualified. Professor Blinka cautions that it is the witness's testimony and not the witness that must be qualified. Blinka, 90

MARQ. L. REV. at 210. As he phrases the question, "what will this witness be asked to tell the trier of fact and can she provide helpful answers?" *Id.* at 211.[4]

¶ 24. Put another way, "whether a witness 'is qualified to give an opinion depends upon whether he or she has superior knowledge in the area in which the precise question lies.' " *State v. St. George*, 2002 WI 50, ¶ 40, 252 Wis. 2d 499, 643 N.W.2d 777 (citation omitted.). The precise question Safarik was being asked to answer for the jury was whether the Recobs died simultaneously from natural causes or as the result of homicide.

¶ 25. The general field of crime scene analysis has been recognized as being a body of specialized knowledge. *United State v. Meeks*, 35 M.J. 64 (C.M.A. 1992). In *Meeks*, the defendant was on trial for a grisly double homicide and, at his court martial, he objected to evidence of an FBI crime analysis. *Id.* at 65. "[T]his evidence consisted of an analysis of the crime scene and certain inferences which the homicide expert would draw from it." *Id.* His objection was that the evidence was speculative, invaded the province of the trier of fact and was unduly prejudicial. *Id.* The U.S. Court of Military Appeals applied the Military Rule of Evidence 702, the equivalent of WIS. STAT. § 907.02, and recognized crime scene analysis as requiring technical or specialized knowledge.

---

[4] Professor Blinka warns against the trial judge making a specific finding that the witness is qualified in a "field such as engineering, medicine, or economics." He writes that such a pronouncement is not required by the rules of evidence or case law and is of little use. Daniel D. Blinka, *Expert Testimony and the Relevancy Rule in the Age of Daubert*, 90 MARQ. L. REV. 173, 211 (2006).

Crime-scene analysis, i.e., the gathering and analysis of physical evidence, is generally recognized as a body of specialized knowledge. Moreover, such evidence has been admitted in several state courts. Finally, admission of such evidence is consistent with the practice in Federal civilian courts of admitting evidence from qualified police officers concerning the techniques and methods employed in criminal acts.

*Meeks*, 35 M.J. at 68 (citations omitted).

¶ 26.   Through education and experience, Safarik had the necessary knowledge to provide helpful answers the jury could use in answering the central question, whether the Recobs died simultaneously from natural causes or as the result of homicide. His education includes a bachelor's degree in human physiology and a master's degree in criminal justice. He has extensive experience including twenty-two years as an FBI agent, and for eleven and one-half years he has been assigned to the BAU of the FBI's critical incident response group. He has analyzed more than 1000 crime scenes, including at least thirty crime scenes where there was an equivocal death—an undetermined cause of death. Some of the cases he has worked on were referred to the FBI by international law enforcement agencies. During the course of his career, he has published articles in peer-reviewed journals and international criminology journals. As a member of the BAU, he has lectured on a variety of subjects to over 15,000 professionals.[5]

---

[5] Challenges to Safarik's expert testimony have been rejected in other jurisdictions. *State v. Yates*, 168 P.3d 359, 386–87 (Wash. 2007), *cert. denied*, 128 S. Ct. 2964 (No. 07–10069) (June 23, 2008); *People v. Fletcher*, 2007 WL 3072864, *unpub. slip op.* (Cal. Ct. App. 2007); *State v. Carlson*, 2006 WL 1237279, *unpub. slip op.* (Wash. Ct. App. 2006); *People v. Duvardo*, 2004 WL

¶ 27. <u>Assistance</u>. WISCONSIN STAT. § 907.02 also requires that the expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." In *Meeks*, the Court of Military Appeals explained:

> A suggested "test" for deciding "when experts may be used" is "whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject . . . ." In sum, the proper standard is helpfulness, not absolute necessity.

*Meeks* 35 M.J. at 68 (citations omitted). In Wisconsin, we use the same test to determine when an expert will be of assistance to the trier of fact. *State v. Bednarz*, 179 Wis. 2d 460, 466–467, 507 N.W.2d 168 (Ct. App. 1993).

¶ 28. The jury was required to resolve a double homicide with no witnesses. The bodies were found in a decomposed and mummified state, raising questions as to the manner or cause of death. The jurors, faced with such a repellent job, would be assisted by a specialized analysis of the crime scene in light of other equivocal deaths and homicide cases. "A homicide and its crime scene, after all, are not matters likely to be within the knowledge of an average" juror. *Meeks*, 35 M.J. at 68–69.

¶ 29. One example of Safarik's specialized analysis is his conclusion that there was "staging" at the death scene that was consistent with homicide. He explained:

2458585, *unpub. slip op.* (Cal. Ct. App. 2004); *People v. Hurth*, 2002 WL 1172930, *unpub. slip op.* (Cal. Ct. App. 2002). We have cited to unpublished opinions for informative purposes only; WIS. STAT. RULE 809.23(3) does not prohibit us from citing unpublished opinions from other jurisdictions. *State v. Stenzel*, 2004 WI App 181, ¶ 18, n.6, 276 Wis. 2d 224, 239, 688 N.W.2d 20.

Staging is a very interesting activity that occurs at a crime scene. It really is. It is an intentional and purposeful manipulation of the forensic and behavioral evidence at a crime scene by the offender.

And the purpose really is to create a new crime scene and a new motive, and the reason that it is done is because in a homicide, the offender perceives that if they simply—they have killed these people, if they simply did not do anything else to the scene, that is they simply just leave, that law enforcement when they look at the scene and . . . at the death investigation, that it's their perception, not always accurate, but it's their perception that law enforcement focus on them as a potential suspect.

After describing the "staging" he saw in photographs from the death scene, Safarik made clear why such evidence was significant:

That's the important aspect about recognizing staging is that it tells law enforcement that on some level there is a relationship between the offender and the victim or the offender and the location or both, and the offender needs to change that perception.

It is beyond the everyday knowledge of an average juror to recognize evidence of "staging" or to understand the implication of such evidence. And, it is certainly beyond the ability of the average juror to correlate all nine factors Safarik considered in reaching his expert opinion.[6]

---

[6] In his reply brief, Swope ruminates, "it is time to examine the limits of Wisconsin's simple and generous statute on expert testimony." We must decline Swope's invitation. We are bound by *State v. Peters*, 192 Wis. 2d 674, 534 N.W.2d 867 (Ct. App. 1995). *See Cook v. Cook*, 208 Wis. 2d 166, 185–90, 560 N.W.2d 246 (1997). Also, our supreme court has declined efforts to jettison the relevancy test. *Conley Publ'g Group, Ltd. v. Journal*

¶ 30. Swope relies on *State v. Dalton*, 98 Wis. 2d 725, 298 N.W.2d 398 (Ct. App. 1980), to support his assertion that Safarik was nothing more than a super juror. Dalton was on trial for first-degree murder, kidnapping by deceit and first-degree sexual assault. *Id.* at 727. Dalton sought to admit the testimony of a psychiatrist who, based on his experience interviewing more than fifty murderers, stated that he had the expertise to determine if Dalton had the intent to murder the victim. *Id.* at 730. We affirmed the trial court's rejection of the proffered testimony, we held that there was no evidence that the psychiatrist had any scientific knowledge which formed the basis for his opinion that Dalton lacked the intent to kill. *Id.* at 731.

¶ 31. *Dalton* does not help Swope. First, Safarik did not testify on the ultimate issue, whether Swope was responsible for the death of the Recobs. His testimony was limited to an opinion—based on his analysis of evidence, crime scene photographs and investigative reports—whether the deaths were natural or criminal. Second, *Dalton* applies the rule from *Steele v. State*, 97 Wis. 2d 72, 97, 294 N.W.2d 2 (1980), that psychiatric specific intent evidence is not admissible in the guilt phase of a homicide trial. Safarik is offering no specific intent evidence.

### CONFRONTATION ISSUE

¶ 32. Swope contends that the trial court erred in permitting Safarik to refer to hearsay opinions of

*Commc'ns, Inc.*, 2003 WI 119, ¶¶ 34–35, 265 Wis. 2d 128, 665 N.W.2d 879. Further we question if the existing federal reliability test is a panacea. One thoughtful scholar has offered several reasons why he believes it is flawed, the primary being that it is unstable and difficult to apply. Blinka, 90 MARQ. L. REV. at 222–223.

Christakis of Harvard and Anderson of the CDC on the odds of both members of a couple dying simultaneously from natural causes. He asserts that any mention of the underlying statistical studies should have been excluded as inadmissible hearsay and because he did not have the chance to cross-examine either person.

■■■

¶ 33.   "Whether the admission of hearsay violates a defendant's constitutional right of confrontation . . . is an issue subject to de novo review." *State v. Bintz*, 2002 WI App 204, ¶ 6, 257 Wis. 2d 177, 650 N.W.2d 913.

¶ 34.   An expert's reliance upon the hearsay statements of others is approved in WIS. STAT. § 907.03:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

■■■

¶ 35.   In *State v. Watson*, 227 Wis. 2d 167, 195, 595 N.W.2d 403 (1999), the supreme court explained:   "In *Kolpin v. Pioneer Power & Light*, 162 Wis. 2d 1, 37, 469 N.W.2d 595 (1991), we stated that 'even if [the expert] arguably relied on hearsay in forming [the expert's] opinion, [the expert's] opinion is still admissible.' " We note, however, that

> [WISCONSIN STAT. §] 907.03 is not a hearsay exception. Hearsay data upon which the expert's opinion is predicated may not be automatically admitted into evidence by the proponent and used for the truth of the matter asserted unless the data are otherwise admissible under a recognized exception to the hearsay rule. (Citation omitted.)

*State v. Weber*, 174 Wis. 2d 98, 107, 496 N.W.2d 762 (Ct. App. 1993).

■

¶ 36. Safarik was asked to analyze all of the evidence from the Recob home to determine if their simultaneous death was naturally or criminally caused —the medical examiner had ruled out accident or suicide. Naturally, he would seek out information on simultaneous death by natural causes to test his hypothesis that the deaths were the result of a crime. The statistics relied upon by Christakis of Harvard and Anderson of the CDC were not admitted into evidence; rather, they served to illustrate the basis for the opinion they shared that it was statistically impossible for a couple to suffer simultaneous death from natural causes—an opinion Safarik took into consideration when reaching his conclusion that death was by a criminal act. *See Nachtsheim v. Beech Aircraft Corp.,* 847 F.2d 1261, 1270–71 (7th Cir. 1988) (The trial court may, in its discretion, allow an expert to testify to otherwise inadmissible facts for the limited purpose of serving as a basis of the expert's opinion.). The trial court did not err in permitting Safarik to rely upon the opinions of Christakis and Anderson.

¶ 37. While Swope asserts that he could not confront these opinions, he does not invoke *Crawford.* We will discuss it to tie up loose ends. In *Crawford,* the Supreme Court ruled that the testimonial statement of a person absent from trial may only be admitted if the person is unavailable and the defendant has had a prior opportunity to cross-examine the declarant about the statement. *Crawford,* 541 U.S. at 67–68. This issue was confronted in *State v. Barton,* 2006 WI App 18, 289 Wis. 2d 206, 709 N.W.2d 93, where Barton argued that his confrontation rights were violated when a labora-

tory supervisor testified about results from a test conducted by a different laboratory technician. *Id.*, ¶ 5. We rejected his challenge, stating, "A defendant's confrontation right is satisfied if a qualified expert testifies as to his or her independent opinion, even if the opinion is based in part on the work of another." *Id.*, ¶ 20. We noted that this result had been reached by other jurisdictions, with several of them reasoning that confrontation rights were not impinged because the hearsay opinions of others were not admitted for the truth of the matter asserted but as the basis of the expert's testimony. *Id.*, ¶¶ 21–22 n.4.

## Conclusion

¶ 38. The court did not err in admitting the expert evidence of Safarik. Safarik's death scene analysis went to a central issue in this case, the cause of the Recobs' simultaneous deaths. Safarik was qualified through his education and experience to answer questions for the jury in a field—unexplained simultaneous deaths—that is beyond the ken of the average juror. Finally, Swope's confrontation rights were not violated when the court permitted Safarik to testify concerning his consultations with third parties. Therefore, we affirm.

*By the Court.*—Judgment affirmed.